# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2008-CA-00416-SCT

*FRANK L. SCHMIDT, SR., AND HENRY W. KINNEY, ET AL.*

*v.*

*CATHOLIC DIOCESE OF BILOXI, THOMAS J. RODI AND DENNIS CARVER*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/27/2008 |
| TRIAL JUDGE: | HON. THOMAS L. ZEBERT |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | VIRGIL G. GILLESPIE |
| | WILLIAM J. BLASS |
| | ERIC D. WOOTEN |
| | HENRY W. KINNEY, PRO SE |
| ATTORNEYS FOR APPELLEES: | JULIE JARRELL GRESHAM |
| | STEPHEN J. CARMODY |
| | KEVIN J. NECAISE |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND REMANDED IN PART - 09/17/2009 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, C.J., LAMAR AND PIERCE, JJ.**

**WALLER, CHIEF JUSTICE, FOR THE COURT:**

¶1.     One hundred and fifty-seven former parishioners of the St. Paul Catholic Church in Pass Christian ("Plaintiffs") filed suit in the Chancery Court of Harrison County against the Catholic Diocese of Biloxi, Inc., Most Reverend Thomas J. Rodi, as Bishop and President of the Biloxi Diocese, and Reverend Dennis Carver, individually and as pastor of St. Paul

Church (hereinafter collectively"Church Defendants"). Plaintiffs sought declaratory and injunctive relief after Bishop Rodi effectively closed the St. Paul Church, which had been damaged in Hurricane Katrina. Plaintiffs asserted, in part, that Bishop Rodi held the St. Paul property in trust for the members of the St. Paul Church, that any financial contributions designated for reconstruction of the church were held in trust for that particular purpose, that Church Defendants had violated said trusts, and that Father Carver had made misrepresentations in soliciting donations for the rebuilding efforts. The chancellor dismissed Plaintiffs' claims with prejudice, finding that the court lacked subject matter jurisdiction based on the church autonomy doctrine of the First Amendment to the United States Constitution. Plaintiffs now file this appeal.[1] We affirm in part, and reverse and remand in part.

## FACTS & PROCEDURAL HISTORY

¶2. The St. Paul Catholic Church was established in 1847 in Pass Christian, by the Roman Catholic Church. The Roman Catholic Church is a hierarchical church, meaning that local churches are subordinate members of the general church, which maintains ultimate authority or control. *See **Watson v. Jones**, 80 U.S. 679, 722-27, 13 Wall. 679, 20 L. Ed. 666 (1872). The St. Paul campus expanded throughout the years, including the establishment of an elementary school. According to latest estimates, its congregation numbered approximately 700 members.

---

[1] Some of the original plaintiffs did not join this appeal.

¶3.    On August 29, 2005, Hurricane Katrina ravaged the Mississippi Gulf Coast.  The storm caused extensive damage to the St. Paul property.  St. Paul's gymnasium and the St. Paul Catholic Elementary School essentially were destroyed.  The actual church building was also damaged, although the extent of the damage is disputed by the parties.  Plaintiffs insist that the church remains structurally sound, that many of its sacred articles were unharmed, and that repair costs should be less than $2.5 million.  Church Defendants maintain that the church and its most sacred places were "destroyed in large part."  According to Church Defendants:

> [T]he altar of God[,] where the miracle of the Eucharist is celebrated[,] was damaged[,] and the tabernacle[,] which is the repository where the Holy Eucharist . . . is kept, was damaged.  A dedicated Catholic Church loses its blessing, and thus, is no longer a Catholic Church, if it is destroyed in large part.  Canon 1212 [of the Code of Canon Law of the Roman Catholic Church] states, "Sacred places lose their dedication or blessing if they have been destroyed in large part . . . ."

Because of this damage, Church Defendants claim that St. Paul ceased to be a Catholic church on August 29, 2005.

¶4.    On November 27, 2005, Bishop Rodi issued a decree merging the St. Paul and Our Lady of Lourdes Parishes to form a new parish called the Holy Family Parish.  The decree stated that the Holy Family Parish would maintain two church edifices, St. Paul Church and Our Lady of Lourdes Church.  The decree also provided that "[i]n accordance with canon 121, Holy Family Parish obtains the goods and patrimonial rights proper to Saint Paul Parish and Our Lady of Lourdes Parish as well as the obligations with which they were burdened . . . ."  Pursuant to this decree, plans were initiated to rebuild the St. Paul Church, and donations were solicited and given for that purpose.  More than one year later, on March 13,

3

2007, Bishop Rodi issued a second decree announcing that Our Lady of Lourdes would be the only church in the Holy Family Parish. This decision effectively closed the doors of the St. Paul Church. According to Father Carver, this decision was made because of a shortage of priests, and because Our Lady of Lourdes Church, unlike St. Paul, is located in a non-flood-zone area.

¶5.    The future use of the St. Paul property remains unclear. Plaintiffs assert that Church Defendants intend to renovate the church and convert it into a community center, a public monument, or a memorial edifice. Church Defendants, however, claim that no decision has been reached as to what will be done with the property.

¶6.    A number of St. Paul's former parishioners, including some of the Plaintiffs in the subject case, filed a canonical appeal through the Roman Catholic Church's ecclesiastical tribunals. On November 30, 2007, the Vatican issued a decree which stated that Bishop Rodi had acted in accordance with the requirements and procedures set forth under canon law.

¶7.    As the canonical appeal process was pending, on May 1, 2007, Plaintiffs filed a thirty-five-page complaint in the Harrison County Chancery Court against Church Defendants, seeking declaratory and injunctive relief, an accounting, and damages. Plaintiffs specified eleven prayers for relief, which may be summarized as follows:

1)    Requested adjudication of whether Church Defendants hold the St. Paul property in trust for the benefit of Plaintiffs, and whether Church Defendants breached such duty by failing to properly maintain the church in the aftermath of Hurricane Katrina, and by converting the property for a secular use, i.e., a community center, without Plaintiffs' consent/approval.

2)    Requested adjudication of whether insurance proceeds stemming from property damage as a result of Hurricane Katrina, and donations made

4

for the specific purpose of St. Paul's reconstruction, are held in trust and must be used exclusively for rebuilding efforts.

3) Requested an accounting from August 29, 2005, of all contributions made to St. Paul Church.

4) Requested a determination as to whether Father Carver made intentional misrepresentations by soliciting donations to rebuild St. Paul, while having personal knowledge that the decision not to rebuild already had been made.

Plaintiffs further sought an injunction to prevent Church Defendants from converting the St. Paul property into a community center, or "selling, encumbering, and/or conveying" any portion of the St. Paul property, without Plaintiffs' approval.

¶8. On June 4, 2007, Church Defendants filed their answer and defenses, with a motion to dismiss for lack of subject matter jurisdiction. In their motion to dismiss, Church Defendants asserted that the chancery court lacked subject matter jurisdiction based on the church autonomy doctrine of the First Amendment, which prohibits civil courts from reviewing internal church disputes that involve matters of church governance, faith, and doctrine. *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 116-17, 97 L. Ed. 120, 73 S. Ct. 143 (1952). For support, Church Defendants attached an affidavit from Bishop Rodi, in which he discussed certain provisions of canon law. On June 15, 2007, this Court entered an order appointing Judge Thomas L. Zebert as special judge to preside over the matter.

¶9. On July 20, 2007, Plaintiffs filed a motion to strike Bishop Rodi's affidavit, or alternatively, to conduct discovery. Plaintiffs argued that their claim was purely secular in nature: Church Defendants had violated neutral principles of Mississippi law by seizing assets held in trust for Plaintiffs' benefit. They submitted that Bishop Rodi's affidavit

5

offered no probative value because it focused solely on his ecclesiastical authority to consolidate the two parishes; a prerogative which they had not questioned. Plaintiffs characterized Bishop Rodi's affidavit as "primarily consisting of unsupported conclusory allegations" that he had complied with canon law. Bishop Rodi had not outlined pertinent canon law procedure, and had offered no evidence that he had followed such procedure. Plaintiffs alternatively requested that they be allowed to conduct discovery with regard to jurisdictional facts.

¶10. A hearing was held on Plaintiffs' motion to strike on August 3, 2007. On August 10, 2007, the chancellor issued an order denying Plaintiffs' motion to strike, but allowing limited discovery by way of written interrogatories. The chancellor agreed with Plaintiffs that Bishop Rodi's affidavit was conclusory and had limited probative value, but he refused to strike it. The chancellor found that if Church Defendants were going to raise canon law as a defense, they should be required to prove that they had complied with those rules. The chancellor thus held that Plaintiffs were entitled to discovery, limited in scope to: (1) the procedure required under canon law for closing a church; (2) documents reflecting whether such procedure was followed in the closing of St. Paul; and (3) whether canon law required church leaders to notify donors who had donated specifically for St. Paul's rebuilding about the change in plans. Thereafter, on August 29, 2007, the chancellor entered an order on discovery issues and a scheduling order. Plaintiffs filed a motion for reconsideration of these two discovery-related orders, as well as a motion for additional time to respond to Church Defendants' motion to dismiss for lack of subject matter jurisdiction. Following a hearing

6

on September 11, 2007, the chancellor extended the time for discovery and granted additional time for Plaintiffs to respond to Church Defendants' motion to dismiss.[2]

¶11.    After conducting a hearing, the chancellor issued a final judgment of dismissal on March 3, 2008. The chancellor characterized the case as an internal administrative matter rather than a property dispute, and found that the issues could not be heard without excessive entanglement with religion. He determined that canon law prescribed a specific procedure for altering a parish, and that Church Defendants had followed such procedure. Furthermore, the chancellor found that, even if a trust existed, Plaintiffs lacked standing. In sum, the chancellor held that the church autonomy doctrine of the First Amendment deprived the court of subject matter jurisdiction, and he dismissed Plaintiffs' claims with prejudice.[3]

---

[2] At the beginning of the September 11, 2007, hearing, the chancellor also granted Henry Kinney's motion to appear pro se.

[3] In their brief, Plaintiffs express bewilderment regarding what they interpret as irreconcilable differences between the chancellor's August 2007 order and his March 2008 final judgment. In his August 2007 order, the chancellor stated that:

> The issues [Plaintiffs] bring before this Court are purely secular in nature . . . . Nowhere in the Complaint is there any demand for the [Church Defendants] to reopen St. Paul church. [Plaintiffs] have simply alleged that it would be a violation of Mississippi law for [Church Defendants] to seize assets they are holding in trust for the [Plaintiffs] and convert these assets for their own use.

But in his March 2008 final judgment, the chancellor held that Plaintiffs' claims required excessive entanglement with religion, which is forbidden by the First Amendment.

Even though the August 2007 order and the March 2008 final judgment reach different conclusions about the nature of Plaintiffs' suit, the two orders are not irreconcilable. In his August 2007 order, the chancellor permitted the parties to engage in limited discovery. He warned the parties, however, "not to read more into this opinion than what is written." He explained that he had no authority to second-guess hierarchical decisions, and that his purpose in allowing discovery was limited to determining what steps were required under canon law, and whether those steps had been followed. After a full hearing on the motion

7

¶12.    Plaintiffs now appeal and raise three assignments of error: (I) whether the chancellor erred in dismissing Plaintiffs' claims for lack of subject matter jurisdiction; (II) whether the chancellor erred in failing to strike Bishop Rodi's affidavit; and (III) whether the chancellor erred in dismissing Plaintiffs' claims with prejudice.  Because we find the first two issues dispositive, we do not address Issue III.

**DISCUSSION**

**I.    Whether the chancellor erred in dismissing Plaintiffs' claims for lack of subject matter jurisdiction.**

¶13.    Subject matter jurisdiction is a threshold inquiry which must be determined before a court may proceed to the merits.  *E.g.*, ***Luckett v. Miss. Wood, Inc.***, 481 So. 2d 288, 290 (Miss. 1985).  A dismissal for lack of subject matter jurisdiction is reviewed de novo. ***Robinson v. TCI/US West Commc'ns***, 117 F.3d 900, 904 (5th Cir. 1997) (citing ***McAllister v. Fed. Deposit Ins. Corp.***, 87 F.3d 762, 765 (5th Cir.1996)).  Findings of fact, however, will not be reversed if the record contains substantial evidence to support those findings.  *E.g.*, ***In re Guardianship of Duckett***, 991 So. 2d 1165, 1173 (Miss. 2008) (citing ***UHS-Qualicare, Inc. v. Gulf Coast Cmty. Hosp., Inc.***, 525 So. 2d 746, 753 (Miss. 1987)).

¶14.    When a plaintiff's allegations of jurisdiction are questioned, the plaintiff bears the burden to prove jurisdiction by a preponderance of the evidence.  ***Rosemound Sand & Gravel Co. v. Lambert Sand & Gravel Co.***, 469 F.2d 416, 418 (5th Cir. 1972) (citing ***McNutt v. Gen. Motors Acceptance Corp.***, 298 U.S. 178, 80 L. Ed. 1135, 56 S. Ct. 780 (1936)).

to dismiss, with further briefing by the parties, and with the benefit of the Vatican's decree affirming Bishop Rodi's actions, the chancellor concluded that the court lacked jurisdiction to hear Plaintiffs' case.

8

¶15.    Challenges to subject matter jurisdiction may be either facial or factual. ***Roman Catholic Diocese v. Morrison***, 905 So. 2d 1213, 1220 (Miss. 2005). "A facial attack alleges the court lacks jurisdiction as a matter of law . . . ." ***Id.*** at 1220-21. With a facial attack, allegations in the plaintiff's complaint are considered true. ***Menchaca v. Chrysler Credit Corp.***, 613 F.2d 507, 511 (5th Cir. 1980) (citing ***Mortensen v. First Fed. Sav. & Loan Ass'n***, 549 F.2d 884, 891 (3d Cir. 1977)). A factual attack, on the other hand, "requires resolution by the trial court of one or more factual disputes in order to determine subject matter jurisdiction." ***Morrison***, 905 So. 2d at 1220-21. In a factual attack, matters outside the pleadings, such as testimony and affidavits, are considered. ***Menchaca***, 613 F.2d at 511. Only those undisputed, well-pled factual allegations in the plaintiff's complaint are accepted as true. ***Morrison***, 905 So. 2d at 1221. Otherwise, the plaintiff's allegations are not presumed true, and the court can decide issues of material fact in order to determine whether or not it has jurisdiction. ***Montez v. Dep't of the Navy***, 392 F.3d 147, 149 (5th Cir. 2004); ***Williamson v. Tucker***, 645 F.2d 404, 412-13 (5th Cir. 1981) (in a factual Rule 12(b)(1) motion, the trial court is free to weigh the evidence and satisfy itself that it has the power to hear the case) (quoting ***Mortensen***, 549 F.2d at 891). The trial court has discretion to devise some evidentiary method for the limited purpose of deciding the jurisdictional issue. ***Moran v. Kingdom of Saudi Arabia***, 27 F.3d 169, 172 (5th Cir. 1994) (citations omitted); ***Paterson v. Weinberger***, 644 F.2d 521, 523 (5th Cir. 1981).

¶16.    The language used in Church Defendants' motion to dismiss and their brief before this Court suggests a facial attack, insofar as no detailed factual argument is advanced. *Cf.*, ***Morrison***, 905 So. 2d at 1221. But in support of their motion to dismiss, Church Defendants

attached an affidavit from Bishop Rodi. Additionally, the lower court allowed the parties to engage in limited discovery on the issue of jurisdiction. Accordingly, we construe Church Defendants' motion to dismiss as a factual attack.

¶17. Plaintiffs assert that this case can be decided on neutral principles of trust and property law; therefore, the chancellor erred in dismissing the case for lack of subject matter jurisdiction. According to Plaintiffs, their case consists primarily of two basic issues: (1) who possesses title to the St. Paul property and (2) what are Church Defendants' obligations with regard to funds donated for the rebuilding of St. Paul Church. Church Defendants contend that "the core" of this dispute is an internal church disagreement over the decision not to rebuild the church, and that Plaintiffs are simply masking their claims as a property dispute.

¶18. Plaintiffs emphatically state that they do not challenge Church Defendants' authority to merge St. Paul Parish with Our Lady of Lourdes Parish. They insist that their administrative and canonical concerns were satisfied through the canonical appeal to the Vatican. The alteration of a parish is, in fact, a matter of internal church government, which lies at the core of ecclesiastical affairs. *See* ***Serbian Eastern Orthodox Diocese v. Milivojevich***, 426 U.S. 696, 721, 96 S. Ct. 2372, 49 L. Ed. 2d 151 (1976); ***Kedroff***, 344 U.S. at 116 (religious freedom includes the "power [of religious bodies] to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine."). An affidavit from William S. Skylstad, Bishop of the Roman Catholic Diocese of Spokane, Washington, Canon 515, Section 2, states that "[i]t is only for the diocesan bishop to erect, suppress, or alter parishes." In the absence of fraud or collusion, our courts must accept the decision of a hierarchical church's highest tribunal on such matters. *See* ***Jones v.***

10

*Wolf*, 443 U.S. 595, 609 n.8, 99 S. Ct. 3020, 61 L. Ed. 2d 775 (1979) (citing *Serbian Eastern Orthodox Diocese*, 426 U.S. at 709, 713 (1976)); *but see* Louis J. Sirico, Jr., *Church Property Disputes: Churches as Secular and Alien Institutions*, 55 Fordham L. Rev. 335, 338, 348 n.61 (1986) (postulating that a civil court's constitutional authority to consider even claims of fraud or collusion remains an open-ended question). There is no "arbitrariness exception" which allows civil courts to inquire whether a hierarchical church complied with its own laws and procedures. *Serbian Eastern Orthodox Diocese*, 426 U.S. at 713, 715 (noting that concepts of due process and fundamental fairness are not relevant to matters of ecclesiastical cognizance).

¶19. With the merger of the two parishes off-limits for our review, there are essentially two issues for which subject matter jurisdiction must be determined. First, Plaintiffs submit that, notwithstanding the merger, Church Defendants remain obligated to hold the St. Paul property in trust for Plaintiffs' benefit, and may not use or dispose of the property in any manner they choose. Second, Plaintiffs contend that all funds raised for the rebuilding of St. Paul Church are held in trust, and that Church Defendants may not divest those funds for any other purpose. Plaintiffs thus seek a legal determination of whether the St. Paul property and/or the funds donated for rebuilding efforts are held in trust, and, if so, whether Church Defendants have breached such trust(s). Third, Plaintiffs assert a claim of intentional misrepresentation against Father Carver. They allege that Father Carver solicited donations for the rebuilding of the church, while having knowledge that the church would not be reopened.

**A.     Whether our courts have subject matter jurisdiction to determine whether the St. Paul property is held in trust.**

11

¶20.    States have "'an obvious and legitimate interest in the peaceful resolution of property disputes, and in providing a civil forum where the ownership [and control] of church property can be determined conclusively.'"  *Church of God Pentecostal v. Freewill Pentecostal Church of God*, 716 So. 2d 200, 204 (Miss. 1998) (quoting *Wolf*, 443 U.S. at 602).  A civil court's authority to resolve such disputes, however, is severely circumscribed by the First Amendment.  *Church of God Pentecostal*, 716 So. 2d at 204 (quoting *Wolf*, 443 U.S. at 602).

¶21.    The Religion Clauses of the First Amendment state that: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."  The first clause, referred to as the Establishment Clause, has been held to command a separation of church and state.  *Cutter v. Wilkinson*, 544 U.S. 709, 719, 125 S. Ct. 2113, 161 L. Ed. 2d 1020 (2005); *Morrison*, 905 So. 2d at 1224-25.  The second clause, known as the Free Exercise Clause, "requires government respect for, and noninterference with, the religious beliefs and practices of our Nation's people."[4]  *Cutter*, 544 U.S. at 719.

¶22.    The First Amendment thus "forbids civil courts from resolving church property disputes by inquiring into and resolving disputed issues of religious doctrine and practice."  *Church of God Pentecostal*, 716 So. 2d at 204 (citing *Wolf*, 443 U.S. at 602).  States are free to adopt any method for adjudicating church property disputes, "'so long as it involves no

---

[4] The Mississippi Constitution affords similar protections: "no preference shall be given by law to any religious sect or mode of worship; but the free enjoyment of all religious sentiments and the different modes of worship shall be held sacred. The rights hereby secured shall not be construed to justify acts of licentiousness injurious to morals or dangers to the peace and safety of the state . . . ."  Miss. Const. art. 3, § 18.

consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith.'" *Church of God Pentecostal*, 716 So. 2d at 204 (quoting *Wolf*, 443 U.S. at 602).

¶23.    Mississippi has adopted the "neutral principles of law" approach for resolving church property disputes. *Church of God Pentecostal*, 716 So. 2d at 206. The neutral-principles approach "relies on objective, traditional concepts of trust and property law . . . ." *Id.* at 205. "It calls 'for the completely secular examination of deeds to the church property, state statutes and existing local and general church constitutions, by-laws, canons, Books of Discipline and the like . . . .'" *Id.* (quoting *Protestant Episcopal Church in Diocese of N.J. v. Graves*, 83 N.J. 572, 417 A.2d 19, 23 (N.J. 1980), *cert. denied sub nom. Moore v. Protestant Episcopal Church in Diocese of N.J.*, 449 U.S. 1131, 67 L. Ed. 2d 119, 101 S. Ct. 954 (1981)). Religious documents must be carefully scrutinized in purely secular terms without relying on religious precepts. *Church of God Pentecostal*, 716 So. 2d at 205-06 (citing *Wolf*, 443 U.S. at 604). If a deed, corporate charter, or religious document incorporates religious concepts in its provisions concerning ownership of the property, the court must defer to the authority of the ecclesiastical body so as to avoid resolving any religious controversy. *Wolf*, 443 U.S. at 604 (citing *Serbian Eastern Orthodox Diocese*, 426 U.S. at 709).

¶24.    Plaintiffs assert that our courts can apply neutral principles of trust law to determine whether the St. Paul property is held in either an express or a resulting trust. Plaintiffs base their express-trust theory on the language contained in various deeds associated with the St. Paul property. These deeds were described in a document attached as "Exhibit A" to Plaintiffs' complaint. This document was drafted by Plaintiffs, and provides a summary of the chains of title for the eight individual parcels which comprise the St. Paul property. Only

13

four of the actual deeds referenced in this summary are included in the record. Church Defendants do not appear to contest the accuracy of Plaintiffs' summary. In their answer, Church Defendants simply stated that the deeds themselves were the best evidence, and denied any allegations that contradicted the actual terms of the deeds. Due to the absence of any specific factual challenge, we accept Plaintiffs' summary as true in describing the various deeds and conveyances below. *See Morrison*, 905 So. 2d at 1221 (in a factual attack, undisputed well-pled factual allegations of a plaintiff are accepted as true).

¶25.    St. Paul originally was established as part of the Catholic Diocese of Natchez. In March 1849, Father Louis Marie Stanislaus Buteux acquired a parcel of real property (Parcel 1) in Pass Christian for the construction of a church.[5] Father Buteux conveyed two subparcels of this property, Parcel 1-A and Parcel 1-B, to Right Reverend William H. Elder, Bishop of the Natchez Diocese. Plaintiffs aver that Buteux remains the owner of the remainder of Parcel 1, less Parcels 1-A, 1-B, and a third subparcel that Buteux conveyed to another individual.[6]

¶26.    In 1871, Rev. Peter Holton and his wife Margaret conveyed a parcel of property (Parcel 2) to Bishop Elder. Bishop Elder later assigned/conveyed his interests to his successor, Right Reverend Francis Janssens, through an unrecorded document. During his tenure, Bishop Janssens was deeded additional property (Parcel 3) from Ellen Curtis, et al.

---

[5] It is unclear when St. Paul's Church was first built. One document in the record states that St. Paul Church was "established" in 1847. Holy Family Parish's website contains a history of St. Paul Parish, which references a church built in 1844 by Father Guillame Labbe, and another church built in 1850 by Father Antoine Paul Guerard. Plaintiffs' complaint states that Father Buteux completed construction of the original St. Paul Church in 1851, and that the church was formally dedicated that same year.

[6] According to Plaintiffs, Buteux died intestate in 1873, and no will has been probated nor has any intestate estate been opened since that time.

14

Bishop Janssens eventually conveyed Parcels 1-A, 1-B, 2, and 3 to his successor, Right Reverend Thomas Heslin. In April 1890, Bishop Heslin acquired yet another piece of property (Parcel 4).[7]

¶27. On September 7, 1905, the Natchez Diocese received its charter of incorporation. Nearly one year later, in a deed dated May 21, 1906, Bishop Heslin conveyed all the property that he held "in trust for said Congregations, Parishes and Missions," to the Natchez Diocese. Bishop Heslin conveyed the property "in fee simple, and according to the trusts provided for in the [Natchez Diocese] charter." The Natchez Diocese charter authorized the Diocese "to hold the titles to all of the property, real and personal[,] belonging to the several Catholic congregations, parishes and missions in the state of Mississippi, in trust for said congregations, parishes and missions respectively . . . ." The charter further authorized the Natchez Diocese "to lease, mortgage or to sell and to deal with any property of said several congregations, parishes and missions [i]n the manner and upon the conditions prescribed by the regulations of the Catholic Diocese of Natchez in Mississippi, relating to and governing [unidentifiable mark] power and authority of the Bishop of Natchez in respect to conveyance by him, by lease, mortgage or sale of said property."

¶28. In subsequent years, various individuals and organizations conveyed additional property to St. Paul. On December 5, 1947, Wilfrida Margaret Gack, individually and as executrix of the Estate of Jane E. Hill, conveyed certain land (Parcel 5) to the "Catholic

---

[7] None of the actual deeds conveying Parcels 1-A, 1-B, 2, 3, and 4 are in the record.

15

Diocese of Natchez in trust for St. Paul's congregation, in Pass Christian, Mississippi."[8] On April 30, 1962, the St. Joseph Alumni Association conveyed property (Parcel 6) to the Catholic Diocese of Natchez-Jackson,[9] as "Trustee for St. Paul's Congregation or Parish in Pass Christian."[10] On December 15, 1969, Prieur James Leary, Sr., conveyed certain property (Parcel 7) to the Natchez-Jackson Diocese.[11] Finally, on September 24, 1970, Betty G. Lutz, et al., conveyed property (Parcel 8) to the Natchez-Jackson Diocese "in Trust for the Congregation of St. Paul's Catholic Church, Pass Christian, Mississippi."[12]

¶29.    On March 1, 1977, the Catholic Diocese of Biloxi was established, when it was split from the Catholic Diocese of Jackson (formerly the Catholic Diocese of Natchez-Jackson and the Catholic Diocese of Natchez).  Most Reverend Joseph L. Howze was appointed as Bishop for the Biloxi Diocese.  On June 6, 1977, Most Reverend Joseph B. Brunini, Bishop of the Catholic Diocese of Jackson, conveyed to Bishop Howze all the property which Bishop Brunini held "as trustee for any parish or church institution" situated in the seventeen counties

_____

[8]  The actual deed conveying Parcel 5 is not in the record.  The quoted language is taken from Plaintiffs' summary.

[9]  In March 1957, the Natchez Diocese amended its charter of incorporation and changed its name to the "Catholic Diocese of Natchez-Jackson."

[10]  The actual deed conveying Parcel 6 is not in the record.  The quoted language is taken from Plaintiffs' summary.

[11]  On February 19, 1986, a property having the exact same description as Parcel 7 was conveyed by O. S. Montagnet, Jr., to the Bishop of the Biloxi Diocese and his successors, in "trust for the Catholic Congregation and Parish for St. Paul's Catholic Church."

[12]  The actual deed conveying Parcel 8 is not in the record.  The quoted language is taken from Plaintiffs' summary.

16

which comprised the Biloxi Diocese. Bishop Brunini conveyed this property to Bishop Howze, "as trustee for the use and benefit of the members of each such Catholic Parish or Congregation." That same day, via a separate deed, all of the property within the newly formed Biloxi Diocese which was previously owned or claimed by the Catholic Diocese of Natchez-Jackson, was conveyed to Bishop Howze, "as trustee for the use and benefit of the members of each Catholic Parish or Congregation" located in the seventeen counties. Bishop Howze thus held title to essentially all Catholic Church property within the Biloxi Diocese, whether real, personal, or mixed, as trustee for any parish or church located within the territory.

¶30. When Bishop Howze retired, Bishop Rodi was appointed to be his successor. In July 2001, Bishop Howze deeded his title to Bishop Rodi as "TRUSTEE for the use and benefit of the members of each such Catholic Parish or Congregation in accordance with the Code of Canon law of the Roman Catholic Church . . . ."

¶31. Notably, a number of the above-referenced deeds contain language that implicates a trust relationship. Under the neutral-principles approach, the interpretation of deeds and trusts is precisely the type of inquiry that is permissible in our courts. *Church of God Pentecostal*, 716 So. 2d at 206. Nevertheless, we find subject matter jurisdiction does not exist due to Plaintiffs' lack of standing.

¶32. Standing is an aspect of subject matter jurisdiction. *Kirk v. Pope*, 973 So. 2d 981, 990 (Miss. 2007) (citing *Breeden v. Kirkpatrick & Lockhart LLP (In re The Bennett Funding Group, Inc.)*, 336 F.3d 94, 102 (2d Cir. 2003)). A lack of standing "'robs the court of

17

jurisdiction to hear the case.'" ***Pruitt v. Hancock Med. Ctr.***, 942 So. 2d 797, 801 (Miss. 2006) (quoting ***McNair v. United States Postal Serv.***, 768 F.2d 730, 737 (5th Cir. 1985)).

¶33.    "Mississippi's standing requirements are quite liberal." ***Dunn v. Miss. State Dep't of Health***, 708 So. 2d 67, 70 (Miss. 1998).  The general standing rule has been stated as follows: "'Mississippi parties have standing to sue 'when they assert a colorable[13] interest in the subject matter of the litigation or experience an adverse effect from the conduct of the defendant, or as otherwise provided by law.'" ***City of Picayune v. S. Reg'l Corp.***, 916 So. 2d 510, 525 (Miss. 2005) (quoting ***State of Miss. v. Quitman County***, 807 So. 2d 401 (Miss. 2001)).  The "individual's legal interest or entitlement to assert a claim . . . must be grounded in some legal right recognized by law, whether by statute or by common law." ***City of Picayune***, 916 So. 2d at 526.  Stated another way, standing is determined by:

> [W]hether the particular plaintiff had a right to judicial enforcement of a legal duty of the defendant or . . . whether a party plaintiff in an action for legal relief can show in himself a present, existent actionable title or interest, and demonstrate that this right was complete at the time of the institution of the action.

***Id.*** (citing ***Am. Book Co. v. Vandiver***, 181 Miss. 518, 527, 178 So. 598, 599 (1938)).  In ***Canovaro v. Brothers of The Order of Hermits of St. Augustine***, 326 Pa. 76, 191 A. 140 (1937), the Supreme Court of Pennsylvania was confronted with a similar set of facts. ***Canovaro***, 191 A. at 140.  In ***Canovaro***, the Archbishop of the Diocese of Philadelphia issued a decree dismembering the Parish of the Church of Our Lady of Good Counsel. ***Id.*** at 142-43. Legal title to the church property was held in the name of the Brothers of the Order of St.

_____

[13] "Colorable," when used to describe a claim or action, means "appearing to be true, valid, or right."  Black's Law Dictionary 212 (abridged 7th ed. 2000).

18

Augustine. *Id.* at 143. Former church members, claiming to be an unincorporated association independent of the Roman Catholic Church, filed suit, alleging that the church and school properties were impressed with a trust for their benefit. *Id.* After the lower court dismissed their claims, the plaintiffs conceded on appeal that they were members of the Roman Catholic faith. *Id.* at 143-44. The Supreme Court of Pennsylvania relied upon a recently enacted statute to hold that plaintiffs had no property rights in the church property. *Id.* at 146-47. In dictum leading to the holding, the *Canovaro* court found that, "[u]nder the controlling church law . . . appellants are no longer members of the parish in which they seek to control the property and are without standing" to maintain suit. *Id.* at 146. The court explained that:

> Under the church law the effect of dismemberment was to cause the parish to cease to exist and to transfer its members to adjoining parishes. There were no longer any members of the original parish. The order of dismemberment was binding on the parish members. Division, dismemberment or suppression of parishes, and the effect thereof on membership are purely ecclesiastical matters, dependent upon the church law as administered by the appropriate authorities and tribunals. *The effect of the dismemberment of the parish and the transfer of Plaintiffs' membership therefrom to other parishes was to deprive them of all rights as members in the church property of the parish from which they were transferred.* Church membership is an ecclesiastical matter, not temporal. There is no property right in membership, and there could be no property rights in lay members except through their membership in the congregation.

*Id.* at 145 (citations omitted) (emphasis added). Pennsylvania courts repeatedly have affirmed this principle. *Post v. Dougherty*, 326 Pa. 97, 101, 191 A. 151 (1937) (stating in dictum that "[t]he effect of the suppression of the parish was to cause the lay members to lose their membership therein, and become members of another parish. Having lost their membership in the parish, they have no standing."); *St. Peter's Roman Catholic Parish v. Urban Redevelopment Auth.*, 394 Pa. 194, 198, 146 A.2d 724 (1958) ("a member of a parish has no

19

property right in his membership or any property right in church property save as a member");

*Croatian Roman Catholic Congregation v. Wuerl*, 447 Pa. Super. 208, 211, 212, 668 A.2d 1151, 1152-53 (Pa. Super. 1995) (relying upon *Canovaro* and *Post* to preclude the exercise of jurisdiction); *see also Galich v. Catholic Bishop of Chicago*, 75 Ill. App. 3d 538, 546, 394 N.E.2d 572, 578 (App. Ct. Ill. 1979) (quoting *Canovaro* to define the extent of plaintiffs' property rights).

¶34.   We find *Canovaro* and its progeny instructive for this case.  The extent of Plaintiffs' property or beneficial interest in the St. Paul property, if any, was inextricably tied to their status as members of St. Paul Church or Parish.[14]  Because such church or parish no longer exists, Plaintiffs have no standing to assert a claim for any interest they may or may not have had in church property.

¶35.   We note one Mississippi case in which a local church within a hierarchical church association was dissolved by hierarchical authorities, and yet its former members were allowed to intervene in subsequent litigation over the ownership or control of church property. *Sustar v. Williams*, 263 So. 2d 537, 537-40 (Miss. 1972).  In *Sustar*, the issue of standing was

---

[14]   Plaintiffs assert that the St. Paul congregation—which they deem to be the true beneficiary of the trust—still exists as an identifiable beneficiary.  Plaintiffs essentially attempt to distinguish the St. Paul congregation from the St. Paul Parish by asserting that only the parish, not the congregation, has been extinguished. We are unpersuaded.  The terms "parish" and "congregation" have been found to be essentially interchangeable. James A. Coriden, *The Parish in Catholic Tradition*, 19-20 (Paulist Press 1996) ("From the sixth century on, however, the terminology became more uniform, *with local congregations called parishes* and the larger groupings of local churches within a territory and overseen by a bishop called dioceses . . . ."); *Wuerl*, 668 A.2d at 1153.  Thus, neither the St. Paul Parish nor the St. Paul congregation still exists.  Rather, both have merged with the Holy Family Parish, which has, in turn, assumed the extinct parish or congregation's property, rights, and obligations.

neither raised or discussed. *Sustar*, 263 So. 2d 537. The former church members in that case intervened under two statutes which allowed sixty-six-and-two-thirds percent of the beneficiaries of a religious trust to take over and divest the mother church of trust property if the beneficiaries determined that there existed "a deep-seated and irreconcilable" disagreement. *Id.* at 539-43 (citing Miss. Code Ann. §§ 1273-01, 1273-02 (Supp. 1971)). These statutes, however, were deemed unconstitutional, and the case was remanded. *Id.* at 543. It is unclear whether the former church members were permitted to remain in the suit on remand, and, if so, on what grounds. *See id.* Because of its unique facts, we find *Sustar* distinguishable.

¶36. Plaintiffs alternatively suggest that the St. Paul property is subject to a resulting trust for their benefit because some of them donated money to purchase certain parcels and to build the current church. Yet, donors who make gifts for a specific purpose, or who make general contributions with the intent to benefit only a certain parish, do not acquire any beneficial or ownership interest in the assets acquired by the church. *Committee of Tort Litigants v. The Catholic Diocese of Spokane (In re The Catholic Bishop of Spokane)*, 329 B.R. 304, 329-30 (Bankr. E.D. Wash. 2005). Plaintiffs thus have no legally enforceable interest in the St. Paul property, and lack standing to assert a resulting trust, as well.

¶37. We find that Plaintiffs lack standing to assert that the St. Paul property is held in trust for their benefit. Accordingly, we affirm the chancellor's finding that subject matter jurisdiction does not exist over this particular claim.

**B.** **Whether subject matter jurisdiction exists to determine if donations made for the specific purpose of rebuilding the St. Paul Church are held in trust.**[15]

¶38. Plaintiffs submit that Church Defendants hold any donations made for the purpose of rebuilding the St. Paul Church in trust. They argue that these funds were given based on Church Defendants' promise to rebuild the church, and that the funds may not be used for any other purpose. They assert that Church Defendants breached their fiduciary duties by merely contacting donors for permission to use the donors' contributions toward a different purpose. Plaintiffs thus seek to enjoin the diversion of the funds, and request an adjudication of whether Church Defendants' decisions have been fiscally irresponsible, and whether those funds must be used in a manner mutually agreeable to them or in their best interest.

¶39. The chancellor dismissed these particular claims based on an opinion from the Supreme Court of North Carolina. *Harris v. Matthews*, 643 S.E.2d 566 (N.C. 2007). *Harris* states that:

> Determining whether actions, including expenditures, by a church's Father, secretary, and chairman of the Board of Trustees were proper requires an examination of the church's view of the role of the Father, staff, and church leaders, their authority and compensation, and church management. Because a church's religious doctrine and practice affect its understanding of each of these concepts, seeking a court's review of the matters presented here is no

---

[15] As previously stated, Plaintiffs also claim that Church Defendants hold in trust the insurance proceeds stemming from the damage caused by Hurricane Katrina. This particular issue is not fully developed in the briefs, and no authority is cited for such proposition. Presumably, Plaintiffs seek to impose a constructive trust on the insurance proceeds. *McNeil v. Hester*, 753 So. 2d 1057, 1064 (Miss. 2000) ("A constructive trust is a fiction of equity created for the purpose of preventing unjust enrichment by one who holds legal title to property which, under principles of justice and fairness, rightfully belongs to another.") (citing *Allgood v. Allgood*, 473 So. 2d 416 (Miss. 1985)). We find no basis for imposing a constructive trust on any insurance proceeds in this case.

different than asking a court to determine whether a particular church's grounds for membership are spiritually or doctrinally correct or whether a church's charitable pursuits accord with the congregation's beliefs. None of these issues can be addressed using neutral principles of law.

*Id.* at 571.

¶40. Generally, civil courts may not second-guess church administrative or management decisions, or substitute their judgment in place of the church's. *See id.*; *but see **Bible Way Church of Our Lord Jesus Christ of the Apostolic Faith of Washington, D.C. v. Beards***, 680 A.2d 419, 428 (D.C. 1996) (stating that if a church has adopted clear, objective accounting and reporting standards that do not implicate doctrinal decision-making in their enforcement, then arguably a civil court can apply them). We find that the chancellor correctly determined that our courts may not consider whether Church Defendants' management or administrative decisions were fiscally irresponsible, or whether those decisions were in the best interests of parishioners. But, for the reasons set forth below, we find that the chancellor erred in dismissing Plaintiffs' claim(s) that Church Defendants improperly diverted designated funds.

¶41. While churches have large, almost-unfettered discretion in their administrative decision-making, they are not entitled to violate recognized duties or standards of conduct. *See **Morrison***, 905 So. 2d at 1242. ***Morrison*** recognizes a church or religious organization's potential liability for diverting funds which have been solicited and accepted for a particular purpose, toward an unauthorized purpose. *See id.* In ***Morrison***, in dictum, this Court stated that:

> [E]ach cause of action asserted against a religious organization claiming First Amendment protection, must be evaluated according to its particular facts. For instance, with respect to a claim of breach of fiduciary duty, a religious organization might enjoy First Amendment protection from claims of failure to

23

provide a certain quantity or quality of religious instruction in exchange for tithes and offerings, *but might not enjoy such protection from claims that it solicited and accepted funds to be held in trust for a specific, stated purpose, but spent the funds for an unauthorized purpose.*

*Id.* (emphasis added).

¶42.   The general law of contributions has been stated to be: "Where a religious society raises a fund by subscription for a particular purpose, it cannot divert the funds to another purpose, and, if it abandons such purpose, the donors may reclaim their contributions." ***Columbus Cmty. Hosp., Inc. v. Califano***, 614 F.2d 181, 187 (8th Cir. 1980) (quoting ***Barker v. The Wardens & Vestrymen of St. Barnabas Church***, 176 Neb. 327, 337, 126 N.W.2d 170, 177 (1964)); ***Dunaway v. First Presbyterian Church***, 103 Ariz. 349, 442 P.2d 93, 95 (Ariz. 1968).   This principle comports with canon law standards.   Church Defendants readily acknowledge that, under canon law, "[o]fferings given by the faithful for a certain purpose can be applied only for that purpose," and may not be used for any other purpose without the donor's consent.   (quoting Canon 1267 § 3); *see also* 1 William W. Bassett, Religious Organizations and the Law § 5:34 (1997).

¶43.   In ***Barker***, St. Barnabas Church abandoned its new building project.   ***Barker***, 126 N.W.2d at 172.   The executor of an estate filed suit against the Wardens and Vestrymen of St. Barnabas Church to recover $1,000 that plaintiff's decedent had given to the "St. Barnabas Church New Building Fund."   *Id.*   The decedent had signed a pledge card which delineated the purpose and the amount of the contribution.   *Id.* at 173.   The Supreme Court of Nebraska found that the executor had a viable legal claim where (1) money was pledged and paid pursuant to a fund-raising drive to build a new church; (2) the plan was abandoned and the

funds were diverted for a different purpose; (3) the plaintiff demanded that the contribution be returned; and (4) the church refused to refund the plaintiff's donation.[16] *Id.* at 177.

¶44. We find that subject matter jurisdiction exists over a claim that a religious entity breached a fiduciary duty by improperly diverting designated funds. In order to establish a viable claim, a plaintiff must prove certain facts. Both *Morrison* and *Barker* require that the funds be solicited by the church. *See id.*; *Morrison*, 905 So. 2d at 1242. The donor must then pledge his or her contribution for the solicited purpose. *See Barker*, 126 N.W.2d at 177; *Morrison*, 905 So. 2d at 1242.

¶45. We do not in any way suggest that Church Defendants have improperly diverted designated funds. The only issue before us is whether our courts may exercise subject matter jurisdiction over such claims. We simply find that a religious entity is not exempt from these types of suits in a court of law.

**C.    Whether our courts may exercise subject matter jurisdiction over Plaintiffs' intentional-misrepresentation claim against Father Carver.**

¶46. Plaintiffs allege that Father Carver made intentional misrepresentations in soliciting contributions for the rebuilding of St. Paul. The crux of Plaintiffs' allegation is that Father Carver knew that the St. Paul church would be closed, but continued telling potential donors that the church would be rebuilt.

¶47. The cloak of religion does not shield religious institutions from civil responsibility for fraud. *Morrison*, 905 So. 2d at 1237 (quoting *Gen. Council on Fin. And Admin. of the*

---

[16] The Nebraska Supreme Court characterized the plaintiff's claim as an action for money had and received, rather than for breach of fiduciary duty. *Barker*, 126 N.W.2d at 175.

25

*United Methodist Church v. Superior Court*, 439 U.S. 1355, 1372-73, 99 S. Ct. 35, 58 L. Ed. 2d 63 (1978)); *see also* **U.S. v. Rasheed**, 663 F.2d 843, 847 (9th Cir. 1981) (the First Amendment does not protect fraudulent activity performed in the name of religion) (citing **Cantwell v. Connecticut**, 310 U.S. 296, 306, 60 S. Ct. 900, 904, 84 L. Ed. 1213 (1940)). Moreover, the First Amendment does not protect fraudulent statements that concern neither religious doctrine nor practice. Bassett, Religious Organizations and the Law § 8:5, n.1 (1997) (citing **Van Schaick v. Church of Scientology**, 535 F. Supp. 1125 (D. Mass. 1982); **Christofferson v. Church of Scientology**, 57 Or. App. 203, 644 P.2d 577 (1982)); **Tilton v. Marshall**, 925 S.W.2d 672, 678-80 (Tex. 1996).

¶48. Plaintiffs here assert a common-law tort which can be decided on neutral principles of law without excessive entanglement in ecclesiastical affairs. Intentional or fraudulent misrepresentation requires:

> (1) a representation, (2) its falsity, (3) its materiality, (4) the speaker's knowledge of its falsity or ignorance of its truth, (5) his intent that it should be acted on by the hearer and in the manner reasonably contemplated, (6) the hearer's ignorance of its falsity, (7) his reliance on its truth, (8) his right to rely thereon, and (9) his consequent and proximate injury.

**McCord v. Healthcare Recoveries, Inc.**, 960 So. 2d 399, 406 (Miss. 2007) (quoting **Franklin v. Lovitt Equip. Co., Inc.**, 420 So. 2d 1370, 1373 (Miss. 1982)).

¶49. In **Maffei v. Roman Catholic Archbishop of Boston**, 449 Mass. 235 (2007), the Supreme Judicial Court of Massachusetts asserted jurisdiction over claims that the Archbishop and clergy members had misrepresented certain facts as they solicited gifts. **Maffei**, 449 Mass. at 251, 255-56. One group of plaintiffs asserted that they had transferred property to the archbishop based on a priest's oral representation that the property would "forever" be

26

used as a church. *Id.* at 251. When the church was closed years later, plaintiffs filed suit requesting, in part, the imposition of a constructive trust based on fraud. *Id.* at 236, 251. The *Maffei* court considered plaintiffs' claim under neutral principles of law, but found the claim to be without merit. *Id.* at 251-52. Another plaintiff asserted a claim of negligent misrepresentation against the archbishop and a certain priest. *Id.* at 255-56. Similar to the to the case before us, the plaintiff alleged that the Archbishop and priest had solicited donations to sustain the church's future existence, while having knowledge that the church would soon be closed. *Id.* at 255-56. The *Maffei* court considered the merits of the claim, but found no supporting evidence. *Id.* at 256.

¶50. We find that subject matter jurisdiction exists over Plaintiffs' claim of intentional misrepresentation; therefore, we reverse the chancellor, and remand this issue for further proceedings consistent with this opinion. By doing so, we do not suggest that Father Carver did, in fact, act fraudulently. But "'[w]hen considering a motion to dismiss, the allegations taken in the complaint must be taken as true . . . .'" *Scaggs v. GPCH-GP, Inc.*, 931 So. 2d 1274, 1275 (Miss. 2006) (quoting *Lang v. Bay St. Louis/Waveland Sch. Dist.*, 764 So. 2d 1234 (Miss.1999)).

## II.     Whether the chancellor erred in failing to strike Bishop Rodi's affidavit.

¶51. A lower court's decision to grant or deny a motion to strike an affidavit is subject to an abuse-of-discretion standard of review. *Buchanan v. Ameristar Casino Vicksburg, Inc.*, 957 So. 2d 969, 972-75 (Miss. 2007).

¶52. Plaintiffs allege that Bishop Rodi's affidavit was irrelevant to the issues before the lower court, and that it should have been stricken. They argue that the affidavit did nothing to challenge the factual allegations in the Plaintiffs' complaint.

¶53. We find that the chancellor did not abuse his discretion in failing to grant Plaintiffs' motion to strike. The chancellor did state that Bishop Rodi's affidavit was laden with "conclusory allegations," and that it offered "limited probative value." Nevertheless, the affidavit was not wholly without value or relevance. The affidavit sought to clarify the nature of the case by referencing applicable provisions of canon law. Its purpose was not to challenge Plaintiffs' factual claims, but to show that the chancery court lacked subject matter jurisdiction to hear Plaintiffs' case.

## CONCLUSION

¶54. We affirm the chancellor's finding that subject matter jurisdiction does not exist over Plaintiffs' claim that the St. Paul property is held in trust. Likewise, we affirm the chancellor's decision not to strike Bishop Rodi's affidavit. We reverse, however, the chancellor's dismissal of Plaintiffs' breach-of-fiduciary-duty claim for the diversion of designated funds, as well as their intentional-misrepresentation claim against Father Carver. We remand these two claims for further proceedings consistent with this opinion. On remand, the chancellor retains the discretion to order an accounting, contingent upon the facts presented. *See Miss. Ins. Guar. Ass'n v. Miss. Cas. Ins. Co.*, 947 So. 2d 865, 876-77 (Miss. 2006) (chancellor's decision to grant or deny a request for an accounting is subject to an abuse-of-discretion standard of review); *RE/Max Real Estate Partners., Inc. v. Lindsley*, 840 So. 2d 709, 712 (Miss. 2003) (To be entitled to an equitable accounting, a party must show:

"(1) the need of discovery, (2) the complicated character of the accounts, and (3) the existence of a fiduciary or trust relation.") (citing *Henry v. Donovan*, 148 Miss. 278, 114 So. 482, 484 (1927)).

¶55.   **AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

**CARLSON, P.J., DICKINSON, LAMAR, KITCHENS, CHANDLER AND PIERCE, JJ., CONCUR.  RANDOLPH, J., CONCURS IN PART AND IN RESULT WITH SEPARATE WRITTEN OPINION JOINED IN PART BY PIERCE, J. GRAVES, P.J., NOT PARTICIPATING.**

**RANDOLPH, JUSTICE, CONCURRING IN PART AND IN RESULT:**

¶56.   I concur with the Majority's result, but not with the finding that the plaintiffs' lack of standing prohibits this Court from exercising subject matter jurisdiction.  I conclude that this Court's inquiry into whether the St. Paul property is held in trust, *vel non,* is constitutionally prohibited.  Our forefathers condemned such an exercise via the Free Exercise Clause of the First Amendment.  *See* U.S. Const. amend. I.  That clause clearly precludes governmental intrusion into ecclesiastical disputes.  The appropriate forum for resolution of such disputes is an ecclesiastical court, thus, no appeal should lie in a secular court.  As this dispute is between various parishioners and the Catholic Diocese of Biloxi, Inc., the appropriate jurisdictional venue lies in the Roman Catholic Church's ecclesiastical tribunals, which already have ruled adversely to the parishioners' claims.  Appeal of that verdict then rests with the Bishop of Rome, the Pope, then ultimately to the "Creator" whom our forefathers referred to as "the Supreme Judge of the world."  *See* Declaration of Independence ¶ 32.

¶57. I concur with Section B of the Majority Opinion, which finds that the chancery court does have subject matter jurisdiction over a claim for breach of fiduciary duty regarding an alleged diversion of monies designated for a particular purpose.

**PIERCE, J., JOINS THIS OPINION IN PART.**