WALLER, Chief Justice, for the court:
¶ 1. Frank Schmidt Sr. and other former parishioners of the St. Paul Catholic Church in Pass Christian (“Plaintiffs”) seek review of the second dismissal with prejudice of their claims against the Catholic Diocese of Biloxi, Inc., Most Reverend Thomas J. Rodi (“Bishop Rodi”), and Rev. Dennis Carver (“Church Defendants”). This is the second appearance of these parties before this Court. See Schmidt v. Catholic Diocese of Biloxi, 18 So.3d 814 (Miss.2009) (“Schmidt /”). On remand, the chancellor denied Plaintiffs’ motions for additional discovery and granted Church Defendants’ motion for summary judgment, dismissing Plaintiffs’ claims with prejudice. Plaintiffs now file this appeal, asserting the chancellor erred in dismissing their claims for diversion of designated funds and intentional misrepresentation.
FACTS & PROCEDURAL HISTORY
¶ 2. The initial facts of this case are taken in part from those in Schmidt I:
¶ 2. The St. Paul Catholic Church was established in 1847 in Pass Christian, by the Roman Catholic Church. The Roman Catholic Church is a hierarchical church, meaning that local churches are subordinate members of the general church, which maintains ultimate authority or control. See Watson v. Jones, 80 U.S. 679, 722-27, 13 Wall. 679, 20 L.Ed. 666 (1871).
[[Image here]]
¶ 3. On August 29, 2005, Hurricane Katrina ravaged the Mississippi Gulf Coast. The storm caused extensive damage to the St. Paul property. St. Paul’s gymnasium and the St. Paul Catholic Elementary School essentially were destroyed. The actual church building was also damaged, although the extent of the damage is disputed by the parties. Plaintiffs insist that the church remains structurally sound, that many of its sacred articles were unharmed, and that repair costs should be less than $2.5 million. Church Defendants maintain that the church and its most sacred places were “destroyed in large part.”
[[Image here]]
¶ 4. On November 27, 2005, Bishop Rodi issued a decree merging the St. Paul and Our Lady of Lourdes Parishes to form a new parish called the Holy Family Parish. The decree stated that the Holy Family Parish would maintain two church edifices, St. Paul Church and Our Lady of Lourdes Church. The decree also provided that “[i]n accordance with canon 121, Holy Family Parish obtains the goods and patrimonial rights proper to Saint Paul Parish and Our *410 Lady of Lourdes Parish as well as the obligations with which they were burdened .... ” Pursuant to this decree, plans were initiated to rebuild the St. Paul Church, and donations were solicited and given for that purpose. More than one year later, on March 18, 2007, Bishop Rodi issued a second decree announcing that Our Lady of Lourdes would be the only church in the Holy Family Parish. This decision effectively closed the doors of the St. Paul Church. According to Father Carver, this decision was made because of a shortage of priests, and because Our Lady of Lourdes Church, unlike St. Paul, is located in a non-flood-zone area.
[[Image here]]
¶ 6. A number of St. Paul’s former parishioners, including some of the Plaintiffs in the subject case, filed a canonical appeal through the Roman Catholic Church’s ecclesiastical tribunals. On November 30, 2007, the Vatican issued a decree which stated that Bishop Rodi had acted in accordance with the requirements and procedures set forth under canon law.
Schmidt I, 18 So.3d at 818-21.
¶ 3. While the canonical appeal was pending,[1]157 former parishioners filed suit (“Schmidt I ”) against the Catholic Diocese of Biloxi, Bishop Rodi, and Father Carver, asserting, in part, that Bishop Rodi held the St. Paul Church property in trust for the members, that any financial contributions designated for reconstruction of the church were held in trust for that particular purpose, that Defendants had violated said trusts, and that Father Carver had made misrepresentations in soliciting donations for the rebuilding efforts. Id. at 819-20. The chancellor dismissed Plaintiffs’ claims with prejudice, finding that the court lacked subject-matter jurisdiction based on the church autonomy doctrine of the First Amendment to the United States Constitution. Id. at 821.
¶ 4. This Court affirmed the chancellor in part, finding that Plaintiffs “lack standing to assert that the St. Paul property is held in trust for their benefit.” Id. at 829. Also, the Court found “that the chancellor correctly determined that our courts may not consider whether Church Defendants’ management or administrative decisions were fiscally irresponsible, or whether those decisions were in the best interests of parishioners.” Id. at 829-30. However, the Court reversed and remanded the chancellor’s dismissal of the diversion-of-designated-funds claim, as well as the claim against Father Carver for intentional misrepresentation, finding subject-matter jurisdiction existed over these claims. Id. at 832.
¶ 5. On remand following Schmidt /, Plaintiffs pursued further discovery, serving Church Defendants with a subpoena duces tecum, directing Father Carver to appear for a deposition and to bring with him documents relating to every donation received by Church Defendants, from both plaintiffs and nonplaintiffs. Subsequently, Church Defendants filed a Motion to Quash the Subpoena, Motion to Stay Discovery, and a Motion for Summary Judgment. Essentially, the discovery dispute revolved around whether Plaintiffs’ claims were limited to those arising solely from Plaintiffs’ donations or whether they could seek discovery and maintain a suit on behalf of a class of donors, irrespective of whether the donors were named Plaintiffs.
*411 ¶ 6. The court ruled in favor of Church Defendants regarding discovery, finding that the “gravamen of both surviving claims pertains to the money each individual Plaintiff paid to [Church Defendants], [and] Plaintiffs are in a unique position to know everything they need to know about any donations which underpin their claims, so as to refute the Church Defendants’ Motion for Summary Judgment without any need for discovery.” The chancellor noted that the Mississippi Rules of Civil Procedure do not recognize class actions; thus, the only claims before the court “are those of the named Plaintiffs.” In addition, the chancellor found that a claim for intentional misrepresentation could have been made only after Bishop Rodi’s March 13, 2007, decree, “when any solicitation statement by Father Carver ... became patently false,” but prior to the time when Plaintiffs received knowledge of the church’s closure.[2]
¶ 7. After hearing oral arguments on Church Defendants’ Motion for Summary Judgment, the chancellor granted the motion.[3] With regard to the diversion claim, the chancellor initially noted that, even taking into account Lead Plaintiff Schmidt’s affidavit opposing the motion, Plaintiffs did not produce evidence that disputed Church Defendants’ evidence regarding contributions received and refunds returned. Citing Schmidt I and its discussion of Barker v. The Wardens & Vestrymen of St. Barnabas Church,[4] the chancellor found that this Court “explicitly recognized that the remedy for an improper diversion-of-designated-funds claim was for the donors to ‘reclaim their contributions.’ ”
¶ 8. The chancellor found that the four elements listed in Barker and cited with approval by this Court, were controlling and provided “the necessary elements of an improper diversion-of-designated-funds claim.”[5] Thus, the chancellor dismissed the claims of the 115 Plaintiffs who did not donate any money to the rebuilding of St. Paul’s. In addition, the chancellor dismissed the diversion claims of thirty-five of the thirty-nine remaining Plaintiffs because they received letters advising them of the change in plans and allowing them to seek a refund but did nothing. Finally, the chancellor dismissed the diversion claims of the remaining four Plaintiffs who were given a refund because they could not satisfy the fourth element required of the claim.
¶ 9. Regarding the Plaintiffs’ intentional misrepresentation claim, the trial court found that 115 of the 154 did not contrib *412 ute any funds to rebuild the church; therefore, they could not establish that they had been injured by any alleged misrepresentation. Further, in response to Father Carver’s letter regarding the return of donations, four Plaintiffs requested and received a refund; thus, the lower court found those four Plaintiffs suffered no injury. Finally, of the thirty-five remaining Plaintiffs who donated, none of them requested his or her donations be returned; thus, their claims were dismissed.
¶ 10. Plaintiffs appeal to this Court. The assignments of error they raise may be summarized as followed: (1) whether Plaintiffs can maintain a claim for diversion-of-designated-funds, and (2) whether Plaintiffs can maintain a claim for intentional misrepresentation against Father Carver.[6]

DISCUSSION

¶ 11. This Court reviews the grant or denial of a motion for summary judgment de novo. Johnson v. Pace, 122 So.3d 66, 68 (Miss.2013) (citations omitted). If the pleadings, together with depositions, answers to interrogatories, and affidavits, viewed in the light most favorable to the nonmoving party “show that there is no genuine issue as to any material fact,” then the “moving party is entitled to a judgment as a matter of law.” Id. (quoting Miss. R. Civ. P. 56(c)).
I. Plaintiffs cannot maintain a claim for diversion of designated funds.
¶ 12. Plaintiffs’ diversion-of-designated-funds claim hinges on this Court’s interpretation of Schmidt I. Indeed, Plaintiffs state in their brief that their claims “will either rise or fall on whether the Court finds Plaintiffs have standing to enjoin Church Defendants from diverting designated donations made by both Plaintiffs and non plaintiffs.”
¶ 13. Plaintiffs raise two arguments to support their contention that they have standing to assert claims on behalf of non-plaintiffs and on behalf of the 115 Plaintiffs who did not contribute funds to the rebuilding of St. Paul’s. First, by soliciting and accepting donations to rebuild St. Paul’s, Church Defendants created a charitable trust, which Church Defendants were required to hold for the benefit of the Holy Family Parish; therefore, Plaintiffs, as members of the Holy Family Parish, have standing to seek information regarding and assert claims on behalf of everyone who donated, regardless of their status before the court. Second, Plaintiffs contend Schmidt I did not limit their diversion claims to those donations made by named Plaintiffs, nor did this Court limit the remedy of Plaintiffs to a return of their donations; thus, the lower Court erred in dismissing those Plaintiffs who did not donate. As a threshold issue, we find that Plaintiffs do not have standing to assert claims on behalf of parties not before the court.
A. Plaintiffs do not have standing to assert claims on behalf of nonplaintiffs or those who did not donate due to any alleged charitable trust.
¶ 14. Standing is one aspect of subject-matter jurisdiction. Schmidt I, 18 So.3d at 826 (citing Kirk v. Pope, 973 So.2d 981, 990 (Miss.2007)). “Mississippi’s standing requirements are quite liberal.” Dunn v. Miss. State Dep’t of Health, 708 So.2d 67, 70 (Miss.1998). This Court has stated the general rule as: “Mississippi parties have standing to sue ‘when they *413 assert a colorable[7] interest in the subject-matter of the litigation or experience an adverse effect from the conduct of the defendant, or as otherwise provided by law.’ ” Schmidt I, 18 So.3d at 826-27 (quoting City of Picayune v. Southern Reg’l Corp., 916 So.2d 510, 525 (Miss.2005)). Stated differently, the question is “[wjhether a particular plaintiff had a right to judicial enforcement of a legal duty of the defendant or ... whether a party plaintiff in an action for legal relief can show in himself a present, existent actionable title or interest, and demonstrate that this right was complete at the time of the institution of the action.” Schmidt I, 18 So.3d at 827 (quoting City of Picayune, 916 So.2d at 526). In addition, “for a plaintiff to establish standing on grounds of experiencing an adverse effect from the conduct of the defendant/appellee, the adverse effect experienced must be different from the adverse effect experienced by the general public.” Hall v. City of Ridgeland, 37 So.3d 25, 33-34 (Miss.2010) (citing Burgess v. City of Gulfport, 814 So.2d 149, 152-53 (Miss.2002)).
¶ 15. Plaintiffs maintain that they may pursue claims on behalf of those who did not donate and those not before the Court, because a charitable trust was established. In support of this argument, Plaintiffs cite City of Picayune v. Southern Reg’l Corp., in which this Court stated “[a] charitable trust is a fiduciary relationship with respect to property arising as a result of a manifestation of an intention to create it, and it subjects the person by whom the property is held to equitable duties and mandates that the property be dedicated to a charitable purpose.” City of Picayune v. Southern Reg’l Corp., 916 So.2d 510, 522-23 (Miss.2005) (citing Restatement (Second) of Trusts § 348 (2005)). As an initial premise, Plaintiffs argue that if a charitable organization accepts donations for a specific purpose, “it is obligated to only use the donation for the designated purpose and ... is prohibited from using the donation for any other purpose.” See 15 Am.Jur.2d Charities § 77. Plaintiffs cite this Court’s quotation in Schmidt I of Canon 1267 § 3[8] and its consistency with “the general law of contributions,” but Plaintiffs carry the Court’s analogy further, arguing Canon 1267 also is consistent with a Mississippi secular charity’s authority to use donations being “subject to the intent of the settlor.” See Schmidt I, 18 So.3d at 830.
¶ 16. Plaintiffs aver that they have standing to pursue these claims, citing Restatement (Second) of Trusts, Section 391, which states in part that a suit to enforce a charitable trust can be maintained by “a person who has a special interest in the enforcement of the charitable trust,” and if the trust is created for a small class of persons, “a member of the association can maintain a suit on behalf of himself and the other members against the trustees for the enforcement of the trust.” See Restatement (Second) of Trusts § 391, cmt. (c).[9] See also Bogert, *414 The Law of Trusts and Trustees § 414 (1964) (Stating that if a trust is created for a definite local church, the members have a certain interest in enforcing the trust.) Plaintiffs contend that Church Defendants solicited donations for the repair of St. Paul’s, which was within the Holy Family Parish; Church Defendants “received the donations for and on behalf of the Holy Family Parish;” Church Defendants were then obligated to hold said donations for the benefit of the members of the Parish and subsequently were bound to “follow the intentions of the donors and utilize the donations for the intended purpose.” Therefore, because Plaintiffs were all members of the Holy Family Parish, they were beneficiaries of the donations, and, as such, “a definable class of persons of the Catholic Faith; distinguishable from both the general public and other Catholics.”
¶ 17. As acknowledged in the chancery court’s opinion, there is no class-action rule in Mississippi state courts that would allow Plaintiffs to make claims and arguments on behalf of parties not before the court. See USF & G of Miss. v. Walls, 911 So.2d 463, 468 (Miss.2005) (“Accordingly, as we have not made a rule which provides for class actions, they are not a part of Mississippi practice — chancery, circuit, or otherwise.”).[10] After Church Defendants decided not to rebuild St. Paul’s, they sent letters to donors advising them of their decision not to rebuild and stated “that if you wish for any reason to receive a refund of your donation, [Church Defendants] would be most happy to accommodate you.”[11] We find that Schmidt I established that each individual donor may request his or her donations returned; however, Plaintiffs, as alleged beneficiaries of a charitable trust, cannot have a civil court force Church Defendants to do anything with donations from parties not before it.[12] As this Court stated in Schmidt I, standing depends on whether a particular plaintiff can find, in himself, “a right to judicial enforcement of a legal duty of the defendant.” Schmidt I, 18 So.3d at 827 (quoting City of Picayune, 916 So.2d at 526) (emphasis added). The relief sought by Plaintiffs, as alleged beneficiaries of a charitable trust, falls outside any legal interest in donations that are not their own. See City of Picayune, 916 So.2d at 528. We find that Schmidt I recognized a right to judicial enforcement of a claim for diversion of designated funds, but only in those Plaintiffs who contributed to the rebuilding of St. Paul’s. Plaintiffs are attempting to maintain claims against a hierarchical church, in which they have no control over management decisions, and thus, no proprietary interest in anything but the donations they themselves contributed. See id.
¶ 18. In Schmidt I we found Plaintiffs did not have standing to assert the St. Paul real property was held in trust for their benefit, citing cases in other jurisdic *415 tions that addressed this issue. Schmidt I, 18 So.3d at 823-829. Thus, we disagree with Church Defendants’ contention that Schmidt I foreclosed Plaintiffs’ trust argument with regard to donations made for the specific purpose of rebuilding St. Paul’s. However, when this Court analyzed Plaintiffs’ claims for a diversion of designated funds, we did not discuss trust law to find Plaintiffs could maintain a suit for diversion of designated-funds. See id. at 829-831. Instead, this Court cited cases dealing with the general law of contributions. We did this for a reason; that reason being the problem the general law of contributions addresses and the remedy applied. Therefore, we find that, to the extent Church Defendants were holding designated donations in an alleged trust, only those who donated had a legally enforceable interest in their donation, and thus, standing to bring a claim for diversion of designated funds. See City of Picayune, 916 So.2d at 528. Although some Plaintiffs have standing to bring a claim, they did not meet the necessary elements to maintain a diversion-of-designated-funds claim as set out in Schmidt I.
B. Schmidt I established the requisite elements for a diversion-of-designated-funds claim.
¶ 19. Finding subject-matter jurisdiction existed over Plaintiffs’ claims for diversion of designated funds, this Court in Schmidt I first noted that, “[wjhile churches have large, almost-unfettered discretion in their administrative decision-making, they are not entitled to violate recognized duties or standards of conduct.” Id. at 830 (citing Roman Catholic Diocese of Jackson v. Morrison, 905 So.2d 1213, 1242 (Miss.2005)). We quoted the general law of contributions, stating “[w]here a religious society raises a fund by subscription for a particular purpose, it cannot divert the funds to another purpose, and, if it abandons such purpose, the donors may reclaim their contributions.” Schmidt I, 18 So.3d at 830 (quoting Columbus Cmty. Hosp., Inc., v. Califano, 614 F.2d 181, 187 (8th Cir.1980) (quoting Barker v. The Wardens & Vestrymen of St. Barnabas Church, 176 Neb. 327,126 N.W.2d 170, 177 (1964))). The opinion then analyzed Barker, noting that the Nebraska Supreme Court, when faced with a similar factual situation, found “a viable legal claim where (1) money was pledged and paid pursuant to a fund-raising drive to build a new church; (2) the plan was abandoned and the funds were diverted for a different purpose; (3) the plaintiff demanded that the contribution be returned; and (4) the church refused to refund the plaintiffs donation.” Schmidt I, 18 So.3d at 830 (citing Barker, 126 N.W.2d at 177). Finally, the Court found that subject-matter jurisdiction existed “over a claim that a religious entity breached a fiduciary duty by improperly diverting designated funds.” Schmidt I, 18 So.3d at 830.
¶ 20. Plaintiffs label the Schmidt I Court’s discussion of Barker “dicta,” and argue the lower court “improperly declared dictum in the Schmidt decision was the law of the State of Mississippi.” They note that Barker and Roman Catholic Diocese v. Morrison[13] were cited when this Court “established the following requirements” for a diversion-of-designated-funds claim: “[t]o establish a viable claim, a plaintiff must prove certain facts.” Both Morrison and Barker require that the funds be solicited by the church. The donor must then pledge his or her contribution for the solicited purpose. Schmidt I, 18 So.3d at 830-31 (citations omitted). Thus, the crux of Plaintiffs’ contention is that Schmidt I required only the above *416 two elements to establish a claim for diversion of designated funds.
¶ 21. With the above reading of Schmidt I as their foundation, Plaintiffs argue this Court “did not intend for Plaintiffs’ diversion claim to be limited to Plaintiffs’ donations, because if this had been the Court’s intention, it would have used ‘plaintiff instead of ‘donor’ in its findings.” Plaintiffs aver this Court never expressly adopted all four elements listed in Barker; nor did this Court state the only remedy was for Plaintiffs to reclaim their contributions. Thus, the chancellor erred by limiting Plaintiffs’ claims to those before the Court and by requiring them to establish the four elements from Barker.
¶ 22. We find that Plaintiffs’ argument is without merit. In Schmidt I, this Court expressly stated, with regard to Plaintiffs’ diversion claim, that the “only issue before us is whether our courts may exercise subject-matter jurisdiction over such claims.” Schmidt I, 18 So.3d at 831 (emphasis added). The only express finding of the Court regarding a diversion-of-designated-funds claim was that subject-matter jurisdiction existed; thus, courts of this state could hear such a claim. Therefore, Schmidt I neither officially adopted elements for a diversion-of-designated-funds claim, nor addressed whether Plaintiffs had standing to pursue claims on behalf of all who had donated. See id. This is simply because these issues were not before this Court. Thus, this Court’s use of “donor” when discussing the commonalities between Barker and Morrison was dicta. The chancellor correctly applied the elements of Barker to Plaintiffs’ diversion-of-designated-funds claim.
¶23. The lower court found that the elements of Barker were quoted and cited favorably by this Court; these elements controlled Plaintiffs’ diversion claim and therefore provided “the necessary elements of an improper diversion-of-designated-funds claim.” Under Plaintiffs’ interpretation, all that is needed to establish a claim for a diversion of designated funds, is that a religious organization solicit donations for a cause, and someone donate for the purpose.[14] This Court’s discussion in Schmidt I of the general law of contributions and the elements of Barker are instructive because of the problem they address and the remedy they provide. The general law of contributions and the elements of Barker directly address Plaintiffs’ claim that a religious organization may not solicit funds for one reason and then divert them for another purpose. See Schmidt I, 18 So.3d at 830; Barker, 126 N.W.2d at 177; Dunaway v. First Presbyterian Church, 103 Ariz. 349, 442 P.2d 93, 95 (1968). If the religious organization abandons the stated purpose, which we emphasize Church Defendants have a right to do, the remedy suggested is that Plaintiffs may reclaim their donations. See Schmidt I, 18 So.3d at 830.
 ¶ 24. We previously have held that courts in Mississippi “may not consider whether Church Defendants’ management or administrative decisions were fiscally irresponsible, or whether those decisions were in the best interests of parishioners.” Schmidt I, 18 So.3d at 829-30. We find that “management or administrative decisions” necessarily include a hierarchical church’s decision whether or not to close, open, build, or rebuild a church, and how much money to expend on such a project. See id. at 822-23 (“[i]t *417 is only for the diocesan bishop to erect, suppress, or alter parishes.”). Thus, we hold that Schmidt I established that Plaintiffs cannot use civil courts to second-guess Church Defendants’ decision not to use the funds to rebuild St. Paul’s.[15] See id. at 829-831. Because we find Plaintiffs cannot tell Church Defendants what to do with the money via civil courts in this state, the remedy is what was stated in Schmidt I: Plaintiffs may obtain a refund of their donations from the church. Only when this request is refused would a prospective plaintiff have a cause of action.[16]
¶ 25. However, Plaintiffs argue they did not request a refund of their donations; rather, their request was for the lower court to “enjoin Church Defendants from diverting the designated donations and for the Church Defendants to replace any misappropriated funds.” Throughout the record and in their briefs, Plaintiffs make several assertions about the remedy to which they are entitled. For example, they argue any misappropriated donations should be “replaced” or that the lower court should order Church Defendants “to follow the intention of the donors.” As noted above, a hierarchical religious organization has a right to change its mind regarding whether to rebuild a church, and that decision cannot be second-guessed by courts in this state. Because Plaintiffs’ only remedy is obtain a refund of their donations, the chancellor correctly found that the elements of Barker, as favorably cited by this Court in Schmidt I, controlled Plaintiffs’ claims.
¶ 26. For the above reasons, we hold that only Plaintiffs who donated have a “legally enforceable right” to the return of their donations once the Church announced it was not going to rebuild St. Paul’s. Further, under this Court’s guidance in Schmidt I, only those Plaintiffs who asked for a refund but were subsequently refused have a claim for a diversion of designated funds.[17] Thus, the lower court properly limited discovery and diversion claims to those individuals actually before the Court and who met the elements outlined in Schmidt I and Barker.
C. Summary judgment on this claim was appropriate.
¶ 27. Church Defendants’ motion for summary judgment essentially stated Plaintiffs did not have a cause of action because “they either (1) did not donate any money; (2) donated and obtained a refund; (3) or donated and did not ask for a refund when offered.” Therefore, money donated by nonplaintiffs was irrelevant. Because we find the lower court was correct in limiting the claims of Plaintiffs to those before the court who actually donated, we find the Plaintiffs had within their possession all the information needed regarding their donations to dispute Church Defendants’ motion for summary judgment.
¶ 28. The lead Plaintiff, Schmidt, filed an affidavit disputing the alleged facts in *418 Church Defendants’ Motion for Summary-Judgment, but the lower court found his affidavit “fail[ed] to specifically demonstrate how postponement of a ruling on the motion [would] enable [Schmidt] by discovery or other means, to rebut the movant’s showing of the absence of a genuine issue of material fact.” See Vaughn v. Miss. Baptist Med. Ctr., 20 So.3d 645, 655 (Miss.2009). In his affidavit, Schmidt does not dispute that Church Defendants sent him the letter stating the change in plans; that the amount they claimed he donated was incorrect; or that his donation was not refunded upon request. Any of the named Plaintiffs who donated were in a position to submit an affidavit to create a genuine issue of material fact regarding their own donations.
¶ 29. Although this Court did not expressly adopt the elements from Barker in Schmidt I, the chancellor was correct in finding they applied to Plaintiffs’ claims. Therefore, because 115 of the 154 Plaintiffs did not donate to rebuild St. Paul’s, the chancellor was correct in dismissing these Plaintiffs’ diversion claims, because they could not meet the threshold requirement of a donation being made for as stated purpose. In addition, four Plaintiffs, including Schmidt, requested and had their donations refunded after receiving the letter from Church Defendants notifying them of the change in plans; therefore, the chancellor also was correct in dismissing their diversion claims. Of the thirty-five remaining Plaintiffs, none requested a refund. Thus, we agree with the chancellor that, because they made no demand, those remaining Plaintiffs failed to satisfy the third and fourth elements to establish a diversion claim.[18] Therefore, because Plaintiffs cannot establish a prima facia case for improper diversion of designated funds, we affirm the chancellors’ grant of summary judgment on this issue.
II. Plaintiffs cannot maintain a claim for intentional misrepresentation against Father Carver.
¶ 30. To make a claim for intentional misrepresentation, Plaintiffs must establish, by clear and convincing evidence:
(1) a representation, (2) its falsity, (3) its materiality, (4) the speaker’s knowledge of its falsity or ignorance of its truth, (5) his intent that it should be acted on by the hearer and in the manner reasonably contemplated, (6) the hearer’s ignorance of its falsity, (7) his reliance on its truth, (8) his right to rely thereon, and (9) his consequent and proximate injury.
Schmidt I, 18 So.3d at 831 (quoting McCord v. Healthcare Recoveries, Inc., 960 So.2d 399, 406 (Miss.2007)) (emphasis added); Gallegos v. Mid-South Mortgage & Inv., Inc., 956 So.2d 1055,1059 (Miss.Ct.App.2007) (recognizing the elements of intentional misrepresentation and fraud are the same). “Clear and convincing evidence is of such a high order that this Court held that the overwhelming weight of the evidence falls short of being clear and convincing.” Phillips Brothers v. Winstead, 129 So.3d 906, 915 (Miss.2014) (internal quotations omitted). This Court has held that “[i]t is clearly the law that a misrepresentation which neither does a plaintiff any harm nor causes a loss is not actionable.” Koury v. Ready, 911 So.2d 441, 446 (Miss.2005) (quoting McMullan v. Geosouthern Energy Corp., 556 So.2d 1033, 1037 (Miss.1990)); Monsanto Co. v. Cochran, 254 Miss. 399, 180 So.2d 624, 628 *419 (1965) (“It is a fundamental principle of law that ... in order to secure relief on a basis of fraud ... the person seeking redress must have been damaged, injured, or harmed as a result of the asserted fraud ....”) (quotation omitted), overruled on other grounds by Tideway Oil Programs, Inc. v. Serio, 431 So.2d 454 (Miss.1983).
¶ 31. The chancery court cited Koury v. Ready in finding Plaintiffs had not established an injury. There, this Court addressed a misrepresentation claim stemming from a dispute between partners of an accounting firm over the nondisclosure of accounts receivable. Koury v. Ready, 911 So.2d 441, 443-447 (Miss.2005). This Court found that the failure of Koury to disclose accounts receivable to Ready “caused no injury” because Ready owed Koury money; therefore, an essential element was missing, and the claim failed. Id. at 446. Plaintiffs argue that Koury is distinguishable because the facts are different, rendering “the Koury Court’s conclusions about the type of injury sufficient to satisfy a misrepresentation claim” inapplicable to the case sub judice.
¶ 32. Plaintiffs contend that they would have met the nine elements required to establish a claim for intentional misrepresentation if they had been allowed to take the deposition of Father Carver. Plaintiffs also argue that the loss of their donations was not the only damages they could suffer, and this Court never said such in Schmidt I. Other than “irreparable harm,” Plaintiffs argue that they, and “many of their ancestors, children, grandchildren ... have attended christenings, weddings, funerals, Mardi Gras balls, draw downs, fish fries, and other events at the former St. Paul Church site. If Church Defendants are allowed to divert the designated donations to other purposes of their choosing, Plaintiffs and the other members of Holy Family Parish will be deprived of the use of the facilities the Most. Rev. Roger Morin committed would be constructed at the former St. Paul Church site.”
¶ 33. As noted above, Plaintiffs’ claims are limited to those actually before the Court. Because 115 Plaintiffs did not donate to rebuild the church, it is impossible for them to have been injured by any alleged misrepresentation by Father Carver. Plaintiffs’ other alleged injury is not an injury this Court can redress, as this Court cannot force Church Defendants to do anything with the St. Paul’s property. Of the thirty-nine remaining Plaintiffs, four requested a refund and did not state by affidavit that they did not receive this refund or that it was for an incorrect amount; therefore, we find they were not harmed by any alleged misrepresentation. The remaining Plaintiffs each were offered refunds of their donations; none averred by affidavit or otherwise that they did not receive this letter; therefore, we find they have suffered no harm by any alleged misrepresentation by Father Carver.

CONCLUSION

¶ 34. Because none of the Plaintiffs established the requisite elements for a diversion of designated funds, we affirm the grant of summary judgment on this issue. In addition, because no Plaintiffs could establish a claim for intentional misrepresentation, we affirm the grant of summary judgment on this issue. Therefore, we affirm the judgment of the Harrison County Chancery Court.
¶ 35. AFFIRMED.
DICKINSON AND RANDOLPH, P.JJ., LAMAR, KITCHENS, CHANDLER, PIERCE, KING AND COLEMAN, JJ., CONCUR.

. On November 30, 2007, the Vatican decreed that Bishop Rodi's actions "were in accordance with the requirements and procedures set forth under canon law.” Schmidt I, 18 So.3d at 819.

.This decree announced that Our Lady of Lourdes would be the only church in the new Holy Family Parish and “effectively closed the doors of St. Paul Church.” Schmidt I, 18 So.3d at 819. Because Bishop Rodi's 2005 decree stated the Church was to be rebuilt, and only a Bishop can make that decision, the chancellor reasoned that Father Carver was under the compulsion of that decree until the 2007 decree "closed the doors” of St. Paul’s. Further, the chancellor noted Plaintiffs did not allege that Bishop Rodi conspired with Father Carver in any alleged misrepresentation, and the remanded claim involved only Father Carver.

. The chancellor adopted Church Defendants’ findings of fact and conclusions of law almost verbatim.

. Barker v. The Wardens & Vestrymen of St. Barnabas Church, 176 Neb. 327, 126 N.W.2d 170 (1964).

. The elements are: "(1) money was pledged and paid pursuant to a fund-raising drive to build a new church; (2) the plan was abandoned and the funds were diverted for a different purpose; (3) the plaintiff demanded that the contribution be returned; and (4) the church refused to refund the plaintiff's donation.” Schmidt I, 18 So.3d at 830 (citing Barker, 126 N.W.2d at 177).

. Plaintiffs appealed the grant of summary judgment. However, many of their assignments of error involve the initial discovery ruling by the trial court.

. "Colorable,” when used to describe a claim or action, means “appearing to be true, valid, or right.” Black’s Law Dictionary 212 (abr. 7th ed.2000).

. "Church Defendants readily acknowledge that, under canon law, '[ojfferings given by the faithful for a certain purpose can be applied only for that purpose,’ and may not be used for any other purpose without the donor’s consent.” Schmidt I, 18 So.3d at 830 (quoting Canon 1267 § 3).

.Plaintiffs argue this principle "has been universally accepted” and include a footnote which cites in part Jones v. Grant, 344 So.2d 1210, 1212 (Ala.1977); Holt v. College of Osteopathic Physicians and Surgeons, 61 Cal.2d 750, 40 Cal.Rptr. 244, 394 P.2d 932 (1964). Jones was a class action by members of a college to enforce a charitable trust, and the *414 holding subsequently was superceded by statute. Jones, 344 So.2d at 1211. Holt was a case involving a suit by one trustee against the other two trustees of a California charitable corporation. Holt, 394 P.2d at 933.

. In addition, Plaintiffs do not make any arguments that they have associational standing. See Belhaven Improvement Ass'n, Inc. v. City of Jackson, 507 So.2d 41, 47 (Miss.1987).

. Church Defendants maintained throughout that any donors wishing to receive a refund of their donations still would be accommodated upon request.

.Some donors may be perfectly fine with Church Defendants' decision to rebuild the Holy Family Parish church on another site and having their donations going toward that project. Therefore, it is up to each individual to decide what they want their money to go toward.

. Roman Catholic Diocese v. Morrison, 905 So.2d 1213 (Miss.2005).

. Plaintiffs' interpretation that the Schmidt I Court established only two elements to find a claim for diversion of designated funds is complicated by the fact that they also argue that, "although not expressly stated, it should go without saying” that the third element was the funds subsequently were diverted. (Emphasis added.).

. Indeed, Plaintiffs admitted several times during arguments they could not make Church Defendants rebuild St. Paul's.

. The reason for this is that a prospective plaintiff could not use civil courts to force Church Defendants to do anything other than this.

. The letter from Church Defendants announcing the change in plans does not ask for the specific consent of the donor to use the funds for another purpose. However, Plaintiffs cite only this Court’s mention of canon law and Mississippi statutes involving secular charities, which is not applicable to Church Defendants. Regarding the interpretation of canon law, this Court cannot second-guess the Vatican's judgment that Church Defendants "acted in accordance with the requirements and procedures set forth under canon law.” Schmidt I, 18 So.3d at 819.

. Again, none of the Plaintiffs averred by affidavit or otherwise that: they did not receive the letter advising them of Church Defendants’ change of plans; they could not reclaim their donations if unsatisfied; the amount of money they donated was incorrect; or they were denied a refund upon request.