LAMAR, Justice,
dissenting:
¶ 56. Because the State wholly'failed to prove fraud or a violation of the Consumer Protection Act, I dissent. But before I can discuss the merits of this decision, I must provide necessary evidence omitted from Justice Chandler’s opinion.
¶ 57. The State claims that Mississippi’s Division of Medicaid (Medicaid) over-reimbursed pharmacies for certain generic drugs because manufacturers intentionally published a price — called the Average Wholesale Price, or AWP — for its drugs that whs not an actual average arid was higher than it should have been.' Specifically, the State claims that, because of Sandoz’s inflated AWPs, pharmacies actually were buying Sandoz’s drugs at a price fifty-seven percent below Medicaid’s reimbursement rate. According to the State, Sandoz benefitted from this practice by marketing the profit potential it produced — pharmacies could make' money buying Sandoz’s drugs at one price, then could get reimbursed by the State at a higher rate that was based on the drug’s AWP. ;
¶ 58. The State’s case rests on the premise that Sandoz caused to be published AWPs that were higher than the prices pharmacies actually were paying and that this resulted in the State reimbursing pharmacies at an inflated price, because the State was entitled to believe — and did believe — that AWP represented actual average wholesale prices. ■ •
¶ 59. Sandoz does not deny that* its AWPs were not actual averages. And there is no dispute that pharmacies paid an average of fifty-severi percent less than what Medicaid reimbursed for' Sandoz products. ' But Sandoz presented evidence that the whole pharmaceutical industry— including Medicaid — has known for decades that AWPs are not based on actual transaction prices and are meant to be suggested or benchmark prices. Since the 1970s, federal Medicaid officials have warned all Medicaid-participating states that AWPs are not actual averages arid are not based on or closely related to the prices pharmacies paid, and that, as a result, they are an unreliable basis for 'reimbursement. The State previously has expressly acknowledged these warnings, and its own published definition of AWP calls it a suggested price and not an actual -average. Perhaps most significantly, while the State is claiming Sandoz’s fifty-seven percent markup Is so high it constitutes fraud, the State was specifically told by federal Medicaid officials that generic AWPs were between forty-two and sixty-five percent higher than actual prices. And Medicaid’s own pharmacy- director did a study that showed reimbursements for generics might have been as much as forty percent higher than pharmacies’ actual costs.
¶60; The damages period alleged by the State is January 1,1991, to October 20, 2005. Medicaid admittedly did not reimburse any claims during this damages period at 100 percent of AWP. Rather, they were all reimbursed at a discount off AWP depending on what formula was in place at the time.[18] In 1990, Medicaid set EAC at *852 AWP minus ten percent. Medicaid considered this rate a “compromise” because, in response to pressure from the Mississippi Pharmacists Association, Medicaid got permission from federal Medicaid officials to set that rate in liep of doing an actual survey of drug costs. In other words, Medicaid chose to set the reimbursement rate based on negotiations with the pharmacists rather than on actual acquisition costs. In 2002, the Legislature gave itself, rather than Medicaid, authority to define EAC and changed it from AWP minus ten percent to AWP minus twelve percent. See 2002 Miss. Laws Ch. 636B § 1. In 2004, the Legislature once again delegated the authority to define EAC back to Medicaid, and on July 1,2005, Medicaid set the rate at AWP minus twenty-five percent, which is where it remains today.

What Federal Medicaid Officials Told Mississippi About Using AWP

¶ 61,. The acronym AWP ceased to represent actual 'averages at some point prior to 1975 (fifteen years before our damages period here). The federal government publicly acknowledged this and has warned against using AWP as a basis for reimbursement — without verification of actual transaction- prices — ever since. In 1975 ■federal officials issued a statement that accompanied some newly issued Medicaid final rules. 40 Fed.Reg. 32284 (July 31, 1975). That statement explained that the federal government had rejected the idea of basing drug reimbursements on AWP. Id. at 32293. The reason given was that AWP was. “not currently determined by surveying drug marketing transactions (i.e., by determining the actual price a pharmacist pays to a manufacturer or wholesaler for a particular drug product), and thus published wholesale prices often are not closely related to the drug prices actually charged to, and paid by, providers.” Id. (emphasis added). The State’s own drug-pricing expert admitted that this statement put Mississippi on notice in 1975 that AWPs were not based on - actual prices. . ■
¶ 62. In 1984 (seven years before our damages period), federal Medicaid officials again sent information to states, including Mississippi, regarding drug prices, urging them to “make a greater effort to determine more closely the price pharmacists pay for drugs rather than using AWP.” That was based on an attached report from the Health and Human Services (HHS) Office of the Inspector General (OIG), which had found that “pharmacies do not purchase drugs at the AWP published in the ‘Bluebook,’ ‘Redbook,’ or similar publications.' Thus AWP cannot be the best — or even an adequate — estimate of the prices providers generally are paying for drugs.”
¶ 63. The next year,. 1985 (six years before our damages period), HHS sent a letter to Medicaid warning of impending corrective action if Medicaid continued to use a flat AWP as the basis for reimbursement. Medicaid Director B.F. Simmons wrote back to HHS, assuring it that ,“[t]he content of [its] letter was no surprise to us here in Mississippi.” This warning came on the heels of a, regional workgroup that had come up with a preferred reimbursement methodology that .would result in a rate that was about fourteen percent lower than AWP. Jim Steele, a Medicaid employee at the time, who would later become Medicaid’s pharmacy director, participated in that regional workgroup, which was designed to come up with a better reimbursement basis than AWP, since AWP was not related to transaction prices.
¶ 64. But Medicaid did not change the reimbursement methodology, so in Janu *853 .ary 1989 (two years before our damages period), HHS sent another letter to state Medicaid officials stating that “nondis-counted or unmodified AWP is not acceptable for State use as the basis for estimated acquisition cost (EAC),J absent any compelling evidence to ' the contrary. [Medicaid] policy is that there-is a preponderance of the evidence that indicates that AWP significantly • overstates the prices that pharmacists are currently paying for drug products." (Emphasis added.)
¶ 65. ■ Later in 1989, HHS again wrote to Medicaid, this time specifically outlining the parts of Mississippi’s state plan that were out of compliance and the steps needed to bring them into- compliance. Among other problems, the letter pointed , out that Mississippi used “[n]on-discounted average wholesale price ... to establish the EAC for -single-source drugs., There is a preponderance of the evidence which indicates that AWP does not represent the price generally and currently paid by providers for a drug.” The letter also warned that “an arbitrarily assigned discount of the AWP is unacceptable also. The discount must be justified and substantiated by data.” -
¶ 66. A 1997 study by the Office ‘of the Inspector General (OIG)' “estimated] that, on average, actual acquisition cost of generic drugs was 42.5 percerit below AWP.” The report of the study was sent to Mississippi and other states. The OIG again reported on actual costs versus AWP in March 2002, this time finding that the difference had grown to an average of 65:93 percent for generic drugs.[19]

Other Pricing Data Available to Medicaid

¶ 67. In addition to AWPs, Medicaid had other pricing data for Sandoz’s drugs. Most importantly, 'for the' first'six years of the damages period, Sandoz submitted the actual average prices that Mississippi retail pharmacies were paying for Sandoz’s generic drugs. These5 “Average Manufacturer Prices” (AMPs) were defined in a contract between Sandoz and Medicaid— and by federal statute — as “the 'average *854 unit price paid to the Manufacturer for the drug in the States by wholesalers for-drugs distributed to the retail pharmacy class .of the trade.,..” See 42 U.S.C. § 1396r-8(k)(l)(2000). In other words, AMPs represented the very number the State claims AWPs were supposed to represent. But AMPs were significantly lower than AWPs. In fact, one document produced by the State in discovery-showed that, sometime after 1991, a Medicaid employee compared some AMPs to some AWPs and determined that there was an eighty-three percent difference in the two. Yet, inexplicably, Medicaid continued to use AWPs to set the reimbursement rate.
¶68. Medicaid also had access .to the price Sandoz charges wholesalers for its drugs, not including any applicable discounts, called a Wholesale Acquisition Cost, or WAC. First DataBank published these WACs alongside AWPs, and there is no dispute that Medicaid had access to these numbers. And while AWPs generally stayed the same, over time the WACs declined as increased competition and other factors drove prices down. One of San-doz’s experts testified that if AWPs were meant to be actual averages, this growing discrepancy would mean that, over time, wholesalers were earning bigger and bigger profits from the sale of generic drugs, while the manufacturers’- profits were staying about the same. But the State’s drug-pricing expert testified that this was not the case: wholesalers’ profits were generally in the two-to-three percent range, regardless of AWP. '

The State’s Only Medicaid Witness

¶ 69. Helen Wetherbee. was Executive Director of Medicaid from 1990 to 1999.. She was the State’s only: witness from Medicaid. Wetherbee testified that Medicaid did receive the various OIG reports and information from federal Medicaid, officials warning against the use of AWPs in reimbursement formulae, but that they were “[n]ot of immediate value” to Medicaid.
¶ 70. Throughout Wetherbee’s directorship, Medicaid published a pharmacy manual that defined AWP as “the manufacturer’s suggested wholesale unit price to retailers” with no mention of it being an actual average. Wetherbee acknowledged this fact but claimed it was just a “very unfortunate choice of words and [did] not comport with her understanding or the understanding [she] had with her staff.” Instead, she .claimed, “everything we did and everything we understood was based on .the actual Average Wholesale Price, not any suggestion •-of a price.” But she admitted that neither Sandoz nor any other drug company told her that AWPs were averages, and that no federal regulation defined the term. Her only basis for believing ■ that AWPs were an actual average was because “the words are what they are.” Wetherbee also conceded that she could náme no one else who ever had said they believed AWPs to be an actual average.
¶ 71. Jack Lee was one of the pharmacy directors under Wetherbee while she was director,- and in 1997 he studied drug prices in Mississippi. Lee conducted the study by reviewing three years of invoices from two Mississippi pharmacies and determined that a more accurate discount for generic drugs may be AWP minus thirty tp forty percent. Wetherbee testified that Lee “came to [her] .with a recommendation that he thought that AWP minus 10 percent might no longer be applicable in Mississippi. And based on what he had found in the pharmacies that he had looked at he was thinking we might need to implement a deeper percent discount.” Wetherbee testified that Medicaid took no action on these results, however, because of the *855 small sample size and the fact that it “was not a formal study.”
¶ 72. Wetherbee left Medicaid in 1999. The State presented' no other Medicaid witnesses or- anyone who testified as to Medicaid’s understanding of-AWP from 1999 to the end of the damages period in 2005.
¶ 73. With this evidentiary background in mind, I now turn to the glaring deficiencies in the State’s case, beginning with the common-law-fraud claim. While Justice Chandler’s opinion correctly states the nine elements of fraud, it wastes no ink explaining how even one of the elements was met; much less all nine, and much less by clear and convincing evidence. And while I would find the- State failed to prove several elements, the failure to prove even one element by clear and convincing evidence is fatal to its claim.
¶ 74. This Court has explained that “[c]lear and convincing evidence is of such a high order that [even] the overwhelming weight of the evidence falls 'short of being clear and convincing.” Kinney v. Catholic Diocese of Biloxi Inc., 142 So.3d 407, 418 (Miss.2014) (quoting Brothers v. Winstead, 129 So.3d 906, 915 (Miss.2014)). Again, failure to prove even one element of fraud by clear and convincing evidence is fatal to its ease, but I will focus my analysis on four of the elements: Sandoz’s intent' to deceive Medicaid; Medicaid’s ignorance about what AWPs represented; Medicaid’s reliance on AWPs as actual averages; and Medicaid’s right to rely on Sandoz’s AWPs as actual averages.

No evidence in the record shows that Sandoz intended to deceive Medicaid,

¶ 75. The State was required to prove by clear and convincing evidence that San-doz possessed “an affirmative- intent to deceive.” Russell v. S. Nat’l Foods, Inc., 754 So.2d 1246, 1256 (Miss.2000). This element “require[s] that the proof must establish- an intent -to deceive and this is indispensable in [a fraud] action.” Anderson Dunham, Inc. v. Aiken, 241 Miss. 756, 133 So.2d 527, 529 (1961) (emphasis added). The trial court concluded that “Sandoz submitted its AWPs to [First DataBank] with the intent of, inducing Medicaid agencies such as Medicaid to rely on its AWPs in paying pharmacies for Sandoz’[s] drugs.” But that conclusion fails to reach the disputed aspect of the intent-to-deceive element: whether Sandoz intended to deceive the State into believing that AWPs were actual averages rather than suggested prices. The.State was required to prov.e either that Sandoz tricked the State into believing AWPs were actual averages, or that Sandoz knew the State believed that and did nothing to correct that belief. See, e.g., State v. Cummings, 203 Miss. 583, 35 So.2d 636, 638 (1948) (explaining that fraud “consists in deception, intentionally practiced to induce another to part with property or to surrender some legal right....”). But the State presented no evidence to support either one. of these, instead relying on evidence that “Sandoz was well aware, that MS Medicaid’s reimbursement methodology relied on reported AWPs.”
' ¶ 76. Justice Chandler’s "opinion follows the trial court in emphasizing First DataBank’s definition of AWP as “the average price paid by the pharmacy to the wholesaler for a particular drug.” See Chandler Op. ¶ 5. But First DataBank’s definitions have no bearing on whether Sandoz possessed the specific intent to deceive Medicaid into believing AWPs were actual averages, because there is no evidence anyone at either Sandoz or Medicaid ever saw those definitions. Wetherbee testified that she had never seen the definitions, nor could she name anyone at Medicaid who had seen them. She also could not name any other Medicaid employee who .thought *856 that AWPs were actual averages. Nor could she point to any statute, regulation, publication, definition, or other outside source for her belief that AWPs were meant to be actual averages.
¶ 77. And perhaps most significantly,. Sandoz points out that it voluntarily submitted its actual average' prices to the State for six years during the damages period, strong evidence - that it' did not intend for the State to interpret AWPs as actual averages. There is no dispute that Sandoz intended for Medicaid to receive and to rely on its AWPs as a basis for reimbursement formulae; but there is a complete absence of evidence that Sandoz intended'Medicaid to believe those were actual averages rather than a suggested price. In fact, the record amply supports the opposite conclusion.
¶ 78. Likewise, Sandoz had no reason to believe that Medicaid understood AWPs to be something other than a suggested price. Medicaid’s publicly 'available pharmacy provider’s manual defined AWP as a “suggested price,” not ah actual average. Finally, the only evidence that Medicaid believed AWPs were actual averages was Wetherbee’s personal belief, a belief not shared, indeed contradicted, by the two pharmacy directors who worked under Wetherbee while she was director, and at least one of her predecessors as executive director. This Court has held that “proving fraud is difficult, as it ought to be. Clear and convincing evidence is required.” Martin v. Winfield, 455 So.2d 762, 764 (Miss.1984). As such, I would find that the State wholly failed to prove intent to deceive.

The State failed to prove that Medicaid was ignorant about what Sandoz’s AWPs were.

¶ 79. The State was required to prove by clear and convincing evidence that Medicaid was ignorant of the fact that Sandoz’s AWPs were not actual averages of prices paid. See Allen v. Mac Tools, Inc., 671 So.2d 636, 642 (Miss.1996). Neither Justice Chandler’s opinion, nor the trial, court mentions or analyzes this essential element, but I would find that the record falls far short of supporting a finding that the State proved it by clear and convincing evidence. For one, Medicaid’s own published definition of AWP confirms it was not ignorant . at all, referring to AWP as a “suggested price,” not an average. And Medicaid’s own .pharmacy director estimated that pharmacies were paying a thirty to forty percent less than published AWPs. Additionally, it is undisputed in this record that Medicaid received warnings from the federal government about using AWPs for reimbursement for decades. The OIG reports foreclose any claim that Medicaid was ignorant that published AWPs were anything other than a suggested price. It was expressly informed that pharmacies were paying, anywhere from 42 to 66 percent less than these published AWPs. Finally, the statement accompanying the Medicaid final rules, fifteen years prior to the damages period, forecloses any claim that Medicaid was ignorant of the fact that published AWPs were not based on actual- transaction.prices,

The State failed to prove that Medicaid relied on Sandoz’s AWPs as something other than, a suggested price, or that such a reliance would have been reasonable.

¶ 80. I examine Medicaid’s reliance and the reasonableness thereof together. Here, the State was'required to prove by clear and convincing evidence (1) that Medicaid relied on the representation that AWPs were averages of the prices pharmacies paid for generic drugs, and (2) that such reliance was reasonable. Franklin v. Lovitt Equip. Co., 420 So.2d 1370, 1372 *857 (Miss.1982). The trial court did not make specific findings on this issue; rather,-it summarily stated that “Medicaid reasonably relied on the information contained within Sandoz’[s] published AWPs.” That framing of the issue is unhelpful. The State did rely on Sandoz’s published AWPs, but the issue in this case is whether the State relied on. those as actual averages, and whether such reliance was reasonable.[20]
¶ 81. One key indication that Medicaid did not actually rely on AWPs as literal averages is its own pharmacy manual, which defined AWPs not as an actual average, but as the “manufacturer’s suggested price.” Wetherbee admitted that this contradicted what she claimed' to be Medicaid’s understanding of AWP and lamented that it was a mistake that should have been corrected but never was. Medicaid’s reliance on' Sandoz’s AWPs would show up primarily in how' it set its reimbursement rates. It set those rates three times during this damages period, but the State failed to produce evidence showing that reliance on Sandoz’s AWPs as an actual price — or anything other than a suggested price — played any part in setting those rates. In fact, the State failed to produce any testimony or affidavit of anyone who actually played a part ⅛ those rate changes.
¶ 82. The trial court’s analysis stopped short in that it determined only that the State relied on Sandoz’s published AWPs, without requiring the State to prove by clear and convincing evidence that it relied on those AWPs as actual averages, which was the basis of the entire lawsuit. I would hold that such an incomplete analysis constitutes error.
¶ 88. And thb ’ trial court’s analysis of the second prong — the reasonableness of Medicaid’s, reliance — is affected by the same error. It ruled that it was reasonable for the State to rely on published AWPs but made no finding on whether it was reasonable to rely on those AWPs as actual averages. This analysis relieved the State of its burden of proof and led to an erroneous finding. The State claimed it was reasonable for it to rely oh the published AWPs as actual averages of prices paid, because the publisher was the “gold standard” for pharmaceutical pricing. It also pointed' out that when the Omnibus Budget Réconciliation Act'(OBRA '90) increased the number of covered drugs from roughly 1,800 to nearly 65,000, the State was forced, to automate and computerize the process. These facts do support the reasonableness of relying on a third-party publisher of drug-pricing information, but they provide no support for the reasonableness of relying on AWPs as something other than what Medicaid had for decades been told about'AWPs.
¶ 84. On the other hand, evidence in the record supports Sandoz’s argument that, from the top of the federal government to Medicaid’s executive director, and from 1975 to 2005, AWP universally was understood and treated as something other than an actual average of prices paid. Examples include the following:
In 1985, the federal government warned Mississippi that AWP was not closely related to actual prices and threatened to withdraw its matching funds, which *858 accounted for approximately eighty percent of Mississippi’s Medicaid budget, if Medicaid continued ,to use a nondis-counted AWP for reimbursement.
During the damages period, both President Clinton and Health and Human Services Secretary Donna Shalala publicly referred to AWP as a “sticker price.”
For the first six years of the damages period, Sandoz voluntarily submitted to Mississippi the prices pharmacies actually paid for its generic drugs. Those numbers showed a significant difference between actual prices and AWP.
The State itself conducted a study in 1989 that indicated pharmacies did not pay AWP.
The State’s Medicaid witness and former Medicaid director told other states’ Medicaid directors that Medicaid was “paying AWP — 10% and that is where the [pharmacies] are making their money.”
The State’s drug-pricing expert acknowledged that federal Medicaid officials had, in 1975, “put Mississippi on notice” that AWPs were not closely related to actual prices.
¶ 85. The State did not dispute any of these facts, and in my, opinion, the trial court erred when it dismissed all this as “scattered and sporadic knowledge of government employees” and as “certain State employees testifying] that they believed that Sandoz’[s] published AWPs were not true average wholesale, prices received by Sandpz for .its drugs_” In sum, I echo the Alabama Supreme Court’s conclusion, regarding this same AWP issue:. “The idea of a person knowing a representation to be false and at the'same time ‘relying1 thereon is a contradiction in terms.” Sandoz, Inc. v. State, 100 So.3d 514, 532 (Ala.2012).

The State failed to prove that Sandoz’s AWPs proximately caused Medicaid any injury.

¶ 86. This Court has held that “recovery is not permitted if the proximate cause of the -monetary loss is other than the fraud alleged.”" Russell v. S. Nat’l Foods, Inc., 754 So.2d 1246, 1256 (Miss.2000). Thus, the State was required to prove that if Sandoz- had reported AWPs that were actual averages, Medicaid would have reimbursed pharmacies. at those averages. The trial court made no specific findings on this element, only ruling that “Sandoz’ [s] conduct caused Mississippi to overpay for its prescription drugs and as a result, Mississippi sustained proximate injury and ■damages as a result of Sandoz reporting false and inflated AWPs.” But the record reveals no testimony from the State’s witnesses, or other evidence presented at trial, asserting that the State would have reimbursed any differently had it known that AWPs were not actual averages.
¶ 87. The State does not even attempt to rebut this argument but simply points to the damages calculation to show that, because th.e State used AWP, it paid more than the average price. But this approach skips the causation inquiry and moves right to damages, bypassing the disputed issue in the case. This Court has held that “[f]raud is never to be presumed or inferred, but must be proven by clear and convincing evidence.” Boling v. A-1 Detective & Patrol Serv., Inc., 659 So.2d 586, 590 (Miss.1995) (citing Nichols v. Tri-State Brick & Tile, Co., 608 So.2d 324, 330 (Miss.1992)).
¶88." The State neither presented at trial nor argued on appeal any evidence from the record that indicates Medicaid would have paid a different amount if- it had known that AWPs were something other than actual average prices. The fact is that, during the damages period, Medic *859 aid never reimbursed at AWP;- it always discounted that rate. It received multiple reports that AWPs were -not actual.averages and, instead of .making any effort to ascertain what those averages were, Medicaid made a policy decision to find a number that got federal approval and encouraged pharmacy participation, which is what it was required to do. Moreover, during the decade since Medicaid allegedly became aware of Sandoz’s “fraudulent” AWPs, it has not changed the reimbursement formula. I would find that the trial court erred when it determined that State met its burden to prove causation by clear and convincing evidence.

The State failed to prove that Sandoz violated the Consumer Protection Act.

¶89. As for.the CPA claims, I would find that the State failed to prove that Medicaid was deceived because Medicaid was repeatedly told that AWPs. are not actual average wholesale prices. Justice Chandler’s opinion ignores this and declares Sandoz’s AWPs to be “false information,” and therefore deceptive. One cannot help but wonder whether the affirming justices would find the term “over-the-counter drugs” deceptive if , applied to a particular drug that never traveled over an actual counter? What about the “world wide web,” which is neither world-wide nor an actual web? The rule this Court announces today makes those terms false and therefore deceptive and a violation of our state’s consumer-protection, laws. Chandler’s Op. ¶ 21'. I find that silly.
¶ 90. Instead, I would follow the Legislature’s admonition and look to federal caselaw for guidance, and therefore use the test for deceptiveness the Federal Trade Commission has established: (1) “There must be a representation, omission, or practice that is likely to mislead the consumer”; (2) .“The act or practice.jnust be considered from the perspective of the reasonable consumer”; ;and (3) “the representation, emission or- practice, must be material.” FTC Policy Statement on. Reception (Oct. 14, 1983) (appended to In re Cliffdale Assocs., Inc., 103 F.T.C. 110, 1984 WL 565319, at *37 (Mar. 23,1984)).
• ¶91. As to the first element, the Commission in Clijfdale, explained that “[t]he test is whether the consumer’s interpretation or reaction is reasonable.” Id. at *46. “When representations or--sales practices are targeted to- a specific- audience, the Commission determines the effect of-the practice on a reasonable .member of that group.” Id. For example, “a practice or representation directed to- a well-educated group, such as prescription drug advertisement to doctors, would be judged in light of the knowledge and sophistication of that group.” Id.
■¶ 92. Conversely, unreasonable interpretations do not give rise to claims of deception:
Some people, because of ignorance or incomprehension, may be misled by even a scrupulously honest- claim. Perhaps a few misguided souls believe, for exam-rple, that all “Danish pastry” is made in Denmark.- Is it therefore an1 actionable deception to advertise “Danish pastry” when it is made in this country? Of course not. A representation does not become “false and deceptive” merely because it will be unreasonably misunderstood by an insignificant and unrepresentative segment of the class of persons to whom the representation is addressed.
Id. at *47 (quoting In re Heinz W. Kirchner, 63 F.T.C. 1282, 1290, 1963 WL 66830 (1963)) (emphasis added).
¶ 93. By ignoring the “target-audience” requirement embodied , in the first two prongs of the correct test, I would find that the trial court reached a wrong result when it determined .Sandoz’s. published *860 AWPs were deceptive. As far as this record shows, only one member of the target audience, Wetherbee, claimed to believe AWPs- had any definition that would render them deceptive. There is no record evidence that any other person in her organization, the pharmaceutical industry, or elsewhere in government shared that understanding. On the contrary, the record establishes that individuals from all cor.ners of the industry (including federal and state Medicaid officials, drug-company officials, First DataBank officials, other publishers of drug-pricing data, and the OIG) had the opposite understanding. As such, I would find that the chancellor’s finding-that Sandoz’s practices were deceptive was manifestly against the weight of the evidence.
¶94. As for the unfairness claim; I would find - that publishing AWPs that were consistent with everything Medicaid was told, publicly and privately acknowledged, and even published about AWPs is not likely misleading. Moreover, since Medicaid has known since the 1970s that AWPs are not based on actual prices, any injury caused by Medicaid relying on AWP as a number based on actual prices was reasonably avoidable, simply by heeding the federal government’s thirty years of warnings.
¶ 95. At least as far back as 1975, the Mississippi Division of Medicaid was repeatedly informed — and warned — that AWPs were not based on transaction prices and were not an adequate basis for their reimbursement formulae. This is undisputed in the record. The State’s reimbursement decisions were based on policy considerations, political negotiations with the Pharmacists’ Association, and requirements of the federal Medicaid program. In so doing, Medicaid succeeded in maximizing pharmacy participation and'obtaining federal approval and matching dollars every year of this damages period.- Although the State’s reimbursement'' formula was based on AWPs provided by Sandoz, the State’s claimed reliance on those numbers as actual averages or even- exaggerated averages was not reasonable. I would reverse and renderithis judgment in favor of Sandoz.
DICKINSON, P.J., PIERCE and COLEMAN, JJ., JOIN THIS OPINION.

. This formula — called the Estimated Acquisition Cost, or EAC — was used only when it yielded the lowest reimbursement rate for generic drugs,- which, during this damages period, was less than half the time. This was true *852 because most of the drugs were reimbursed at the mandatory Federal Upper Limit,-' or FUL,

. Without any record support, or sound reason for doing so, the affirming justices give credence to the State's argument that it knew there was some inflation in AWPs, thus all this evidence of what federal officials told it about AWPs being inflated should not weigh against it. I see nothing in the record below that supports this claim. This lawsuit was pleaded, tried, and decided oil the question of whether AWPs were supposed to mean the actual average of prices paid, not an inflated average. This is reflected in the State’s original complaint, its Sandoz-specific complaint, its arguments and the testimony at trial, its damages calculation, and the trial court’s amended opinion. The ■ only testimony the State introduced regarding Medicaid’s understanding of AWPs was that of Medicaid Executive Director Helen Wetherbee, and she plainly testified that "any difference between AWP and the actual average transaction prices would be inconsistent wi& [her] view of AWP.” (Emphasis added.)" The trial 'court's understanding of the State’s position Was "that the State understood and-relied on the fact that Sandoz’ AWPs meant just what the phrase says "Average Wholesale Prices,” or the average of tho.se prices that a wholesaler received from the sale of Sandoz’ drugs to pharmacies...." Conversely, the trial record is devoid of-'any argument or evidence on what the “expected exaggeration” was-or how "far beyond” . such expectations Sandoz’s. AWPs were. This Court ”do[es] not consider issues raised for the first time on appeal,” Jones v. Fluor Daniel Servs. Corp., 959 So.2d 1044, 1048 (Miss.2007), As such, I think it is improper to consider this argument at all. But this information, admittedly received by the State, informed Medicaid that AWPs were not based on actual prices and were not closely related to prices. It also informed Medicaid that pharmacies were paying anywhere from forty-two to sixty-five percent less than AWP during the damages period; Medicaid’s reimbursement rates were precisely within that range — at fifty-seven percent over actual prices. ' Given all this information in the State’s possession/changing its'argument on appeal does not help it much anyway.

. The State was required to.prove this because that is what it pleaded in its complaint and what it argued before the trial court. On appeal, as mentioned above, its argument is that Medicaid "was entitled to rely on San-doz’s reported AWPs as having a reasonable relationship to a price.” Notwithstanding the unworkable vagueness in that statement, even if that is what Medicaid did rely on, it does not change the reasonableness inquiry under these elements.